**CRONUS LAW, PLLC**

Larry Cohen, AZ Bar No. 010192
Jeff Bouma, AZ Bar No. 011808
Joel Fugate, AZ Bar No. 031739
2601 E Thomas Rd., Ste. 235
Phoenix, AZ 85016
Phone: (480) 467-3188
Fax:    (480) 718-8575
lcohen@cronuslaw.com
jeff@cronuslaw.com
admin@cronuslaw.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Renee Steinaker and David Steinaker a married couple; | Case No.: 2:19-cv-05022-SPL |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' RESPONSE TO DEFENDANT SOUTHWEST AIRLINES, CO.'S MOTION TO DISMISS** |
| Southwest Airlines, Co., a Texas Corporation; Terry Graham and Jane Doe Graham; Ryan Russell and Jane Doe Russell; Defendants XYZ; Corporations I-X; Black and White Partnerships I-X; and Does I-X Under Fictitious Names; | *(Assigned to the Honorable Steven P. Logan)* |
| Defendants. | |

Plaintiffs' hereby respond to Southwest Airlines' Motion to Dismiss and Defendants Graham and Russell's Joinder by requesting the Court deny said Motion and Joinder for the reasons set forth in their Memorandum below.

1

I.    **FACTS THAT MUST BE ASSUMED TO BE TRUE**

The Plaintiffs' Third Amended Complaint ("TAC") specifically alleges that, while working for Defendant Southwest Airlines ("SWA") the two senior officers, Captain Graham ("Graham") and First Officer Russell ("Russell") (collectively ("the Pilots") deliberately and with intent, placed a hidden camera in the forward lavatory of SWA Flight 1088 for the purposes of making illegal secret recordings of the nude buttocks and genitals of men, women and children to satisfy their own prurient and financial goals.  The recording of Plaintiff Renee Steinaker ("Plaintiff" or "Renee") violated Federal and State law (18 U.S.C.A. § 1801; ARS § 13-3019), Federal Aviation Administration ("FAA") regulations and SWA's policies and procedures.

When caught, the Pilots 1) admitted that the cameras were there and were recording the crew and passengers; 2) claimed that SWA itself had implemented this as a policy in all lavatories on all SWA 737-8000 series aircrafts; 3) kept Renee in the cockpit while Russell removed the hidden camera from the lavatory; 4)  disabled the aircraft Wi-Fi system to prevent the flight attendants from reporting to SWA; and 5) immediately upon landing, abandoned their posts and the aircraft leaving the cockpit and a loaded firearm on board.

The crew immediately provided verbal and written reports, including a photograph taken by Plaintiff, the crew believed the reporting of this criminal behavior was a protected activity under Federal Law and company policies. The crew requested the evidence be secured and preserved. SWA refused, and allowed the evidence to remain in the possession and control of the Pilots. It did not preserve any evidence, not even the

2

recordings from its own plane. Most egregiously, it did not take steps to prevent the illegally obtained images from being deleted, saved, shared or distributed. It did not discipline the Pilots. Instead, SWA has engaged in prohibited retaliation against Renee, her crew and her Co-Plaintiff, husband and fellow SWA flight attendant, David Steinaker ("David" or collectively "Plaintiffs")

The Defendants' activities were deliberate, intentional, carried out with ill will and in violation of their duties to Plaintiffs. They proximately caused Renee to suffer severe mental, emotional and physical injuries that have adversely affected her life and ability to engage in her chosen profession of 22 years. Because of his relationship with Renee, David Steinaker has also been singled out and targeted for harassment and retaliation. These intentional acts have caused Plaintiffs to suffer additional emotional distress and financial damages.

## II.    LAW AND ARGUMENT

### A.    Legal Standard For Review

Motions to dismiss per FRCP 12 are difficult to win and not favored. Defendants must prove that under no set of facts could a reasonable juror find in favor of the Plaintiff, and that as a matter of uncontested fact and law, all of Plaintiffs' claims are barred. If the Court cannot make such a determination without having to resolve disputed facts or draw conclusions and inferences against the non-moving party, the motion must be denied and discovery allowed to proceed. The same is true if the Court must consider facts or inferences outside of the scope of the Complaint and Motion to Dismiss.

> The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; "importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.

*Jordan v. Western Distributing Co.*, 286 F.Supp.2d 545, 548 (D.Md., 2003), Although *Jordan* is a 4th Circuit case, both Arizona and the 9th Circuit follow this same standard. The Arizona Supreme Court relied on 4th Circuit precedent in *Ford v. Revlon Inc.,* 153 Ariz 39 (1987), the seminal case in Arizona the intersection between Worker's Compensation ("WC") exclusivity and intentional torts of IIED/Sexual Harassment. *Ford* holds that employees who engaged in sexual harassment, invasion of privacy and/or IIED of co-workers are directly liable for the harm caused by their intentional acts, as are the employer who failed to prevent the acts or failed to investigate those actions and take steps to remedy the harm once the employer learned of the acts and subsequent injuries. Indeed, *Ford* states unequivocally that an employer who fails to protect its employees from intentional harm on the job is both independently liable for the harm it caused, as well as liable for the harm its employee cause, based on the doctrine of *Respondeat Superior.* [1]

---

[1] After describing the facts in the case in *Davis v. United States Steel Corp.*, 779 F.2d 209, 211 (4th Cir.1985) as similar to Revlon's failure to protect Ford, the Arizona Supreme Court stated: "The Fourth Circuit held that although the acts and behavior of the manager were despicable, they did not rise to the level of providing a basis for recovery by the complainant against the corporation for assault and battery or intentional infliction of emotional distress. The

CRONUS LAW, PLLC

The fatal defect in the Motion to Dismiss is that in misrepresenting what the Plaintiffs actually plead, SWA is really disputing both Plaintiffs allegations, especially those regarding Plaintiffs' damages. Defendants repeatedly minimize and gloss over Plaintiffs' repeated plain statements as to the severe and ongoing physical, emotional, mental and financial injuries caused by Defendants. And they repeatedly draw inappropriate inferences and conclusions that favor Defendants', not Plaintiffs'.

### The Workers' Compensation Exclusivity Doctrine Does Not Apply

SWA and the Pilots claim that their actions are protected by Arizona's WC law. That is incorrect. In 1987 the Arizona Supreme Court stated plainly that Arizona's Worker's Compensation Act does not protect employees who intentionally cause harm to other employees, nor does it protect employers who are aware of the intentional acts, but fail to investigate the complaints and protect the employee. (*Id)* The *Ford* decision, which, unsurprisingly neither SWA nor the Pilots discuss, resolved this issue conclusively holding:

> "Revlon contends that this matter is controlled by Arizona Workers' Compensation laws and not by tort law. ***We disagree***. Ford's severe emotional distress injury was found by the jury to be not unexpected and was essentially nonphysical in nature."

(Id at P. 44).  The Court then drove the point home by further stating:

> The acts by Braun and Revlon were not "accidents." Indeed, the jury found both parties liable for the intentional offenses in which they engaged: Braun for assault and battery and Revlon for

court went on to say, however, that "the situation is otherwise with respect to [the employer] and [its] failure to take any action." Id. at 212. ***We believe that Revlon's failure to investigate Ford's complaint was independent of Braun's abusive treatment of Ford.*** *Ford v. Revlon, Inc.*, 153 Ariz. 38, 42–43 (Ariz.,1987)

CRONUS LAW, PLLC

> emotional distress. An injured employee may enforce common-law liability against his or her employer if not encompassed by statute

(*Id.*) In holding that sexual harassment, IIED and Invasion of Privacy are not protected activities, the Court relied upon the Restatement of Torts, the intention of the legislature and common sense. WC law cannot apply to intentional torts such as IIED, sexual harassment, assault and battery, etc., because to hold otherwise would require the Courts to hold that enduring sexual harassment and abuse is a legally sanctioned part of a worker's duties and job description. It is not, as the Court made clear. The Court also made clear in Arizona, a company that refuses to investigate the employee's complaints is independently liable for the damages caused by its failure, even if its employee did not emotionally abuse plaintiff. (*Id.*) [2]

### B.    **Workers' Compensation Does Not Bar Intentional Tort Claims**

SWA's claim that in order to bring this action, Plaintiff must have provided a written rejection of the WC coverage is a red herring because neither Plaintiffs' claims nor injuries are subject to the WC statute. Plaintiff did not suffer physical injury during an accident at work. The Pilots' actions were intentional and planned in advance. The resulting injuries have a physical component, but are primarily mental, emotional and financial. This is not the purview of WC law, which exists to protect employees and workers who are physically injured as a result of accidents, not abuse not related to the

---

[2] Employers who, for whatever reason, cause additional harm to the victims by hiding, ratifying, adopting or perpetuating the harassment and emotional abuse are not only liable under state common law tort theories, but also under Federal law, especially when the employer engages in retaliation and intimidation of its employee.

CRONUS LAW, PLLC

**CRONUS LAW, PLLC**

job. *Jordan, Supra,* is particularly instructive in this regard. "To be within the scope of the employment the conduct must be of the kind the [employee] is employed to perform and …actuated at least in part by a purpose to serve the [employer]." (*Id* at P. 548)

In J*ordan* the employees were on duty, performing their official tasks in a company vehicle at a time and location reasonably related to their jobs. However, what they were doing was clearly *not* what they were hired to do, and the Court easily concluded that the Defendants' actions were so outrageous and far removed from their employer's interests that, while the employer could be sued for failure to train and supervise the employees, it was not liable under *Respondeat* S*uperior.*

> Even assuming *Jordan* is correct as to the second and third elements, …the conduct of Sasser and Meininger,…was not "of the kind" they were employed to perform and was not actuated at least in part to serve Western. …Jordan [does not] allege that Sasser and Meininger were authorized to run cars off the road or threaten individuals with weapons without provocation. In fact, Jordan's allegations make clear that… Sasser's and Meininger's behavior was "unprovoked, highly unusual, and quite outrageous."
> See Sawyer, 587 A.2d at 471.
> (*Id*.)

### C. <u>Plaintiffs' Allegations Establish A Valid Intentional Infliction of Emotional Distress ("IIED") Claim</u>

The Restatement of Torts § 46(1) (1965) which Arizona follows, is cited in both *Ford* and in the Arizona Revised Jury Instructions (5th) ("RAJI 5th") for IIED claims. It establishes that extreme and outrageous conduct that does or may cause severe emotional distress is actionable, regardless of whether the emotional distress inflicted intentionally or through the reckless disregard of the likelihood that it would cause emotional distress. (*Id*.)  IIED is a separate and distinct tort. To prevail, a Plaintiff does not need to plead or

CRONUS LAW, PLLC

prove any elements of other torts such as assault and battery. Restatement (Second) of Torts § 46 comment b (1965).

Further, commented to § 46 states that there is liability "…where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" *Ford, Supra., while c*ommenting notes: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."  Therefore, the disproportionate power of the Pilots and SWA's officers and managers over the Plaintiff is an important additional factor the jury is required to consider in determine the outrageousness of the Pilots' behavior and SWA's response.

### D.       Plaintiffs' Allegations Establish an Invasion of Privacy Claim

In Arizona the gravamen of an action for invasion of the right of privacy is the injury to the feelings of the plaintiff, and the mental anguish and distress caused thereby. (Citations omitted) *Fernandez v. United Acceptance Corp.*, 125 Ariz. 459, 462, (App. 1980). [3] Plaintiff has specifically alleged she suffered severe and ongoing mental emotional and even physical anguish as a result of the Pilots' actions on the flight and SWA's response, which did nothing to protect her or her images and likeness from being

---

[3] "Bodily harm," however, is a broader concept under Arizona law than might be suggested by the common usage of the term. In particular, it comprehends "substantial, long-term emotional disturbances" unaccompanied by any physical injury*" Harris v. Maricopa County Superior Court*, 631 F.3d 963, 978 (C.A.9 (Ariz.),2011)

CRONUS LAW, PLLC

used, shared or put on the internet. Defendants' dismissive comments about her anguish do not comply with either the law, or reality. Her fears and concerns are real and an increasing threat to everyone, but especially women and children who are the most frequent targets and victims. (*See* sections E and G below)

Per Arizona's, RAJI 5th Intentional Tort Instructions for Invasion of Privacy by Intrusion upon Seclusion, to prevail on an Invasion of Privacy Claim, the Plaintiff must prove (1) an intentional intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person; and (3) the invasion was a cause of Plaintiff's damages. *Medical Laboratory Management Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (C.A.9 (Ariz.),2002) (citing the Restatement (Second) of Torts § 652B  The comment to the RAJI notes "Evidence of the circumstances of the alleged intrusion are relevant to whether the conduct is highly offensive including the setting and manner in which the intrusion occurred, the defendant's motives and objectives, and the plaintiff's expectation of privacy." [4] Here, the Plaintiff's expectation of privacy is absolute and unquestionable. The manner in which her privacy was violated is, as a matter of law, outrageous. It is in fact illegal under state and federal law.  The only element that is not established as a matter of law is the Defendants' motives and objectives. Intent is a matter for the jury, as is the Defendants' purpose and objectives

---

[4] The Court also noted: "Although no Arizona case indicates what sort of conduct constitutes a highly offensive intrusion, the illustrations in the comments to the Restatement (Second) of Torts § 652B suggest that it must be an exceptional kind of prying into another's private affairs. *See* Rest. (2d) Torts § 652B, cmt. b. (offering the following examples: …*(2) using a telescope to look into someone's upstairs bedroom window for two weeks and taking "intimate pictures" with a telescopic lens*). (*Id.*) [Emphasis supplied]

9

in watching and recording transmittable images of people using the aircraft lavatory. The only reasonable inference that can be drawn is that the Pilots' motives and intent were neither good nor beneficial to the Plaintiff or the passengers.

The same is true for SWA. This Court cannot, on the basis of the complaint alone determine why SWA chose not to promptly investigate or to at least seize the Pilot's iPads to ensure that any images on them were protected, preserved and could not be viewed or transmitted to others

In ruling on this motion, the Court must disregard Defendants' "trust us" defense. Not under these circumstances when everything that happened after the Pilots were caught violated SWA's own policies and procedures. What motivated the Defendants to repeatedly ignore and violate the policies and procedures, and indeed, basic common sense, is a question for a jury to resolve.

**E.    Plaintiffs' Have Plead Valid Willful Misconduct Claims**

The conduct alleged by the Pilots internally and subsequently by SWA is clearly not the result of an accident. Regardless of which story the jury believes (Digital Peeping Toms, v. a prank by 10-year-old boys who believe joking about watching girls go pee-pee and poo-poo are really funny and protected workplace behavior), what happened on Flight 1088 was not an accident. Defendants admit they planned, staged and executed the appearance of a bathroom video on Flight 1088. At best, the Pilots intentionally recorded and stored at least one video of Graham in the lavatory of a SWA 737, stored it on an iPad intended for use in the workplace, brought it to the workplace, showed it to Plaintiff and

CRONUS LAW, PLLC

then took it with them before anyone could examine it. That was not a mistake, it was an intentional choice to target Plaintiff as their victim.

The alternative, and indeed, far more likely scenario is that the Pilots engaged in criminal and sexually abusive behavior using a high resolution, motion activated camera they hid in the lavatory. Small cameras are able to be disguised as an innocuous object, such as a screw head (See Exhibit "A"). These cameras can be connected to phones and iPads via Bluetooth or the aircraft WiFi system which records and stores them for later use, that is willful misconduct.

To the extent that SWA's training, supervision and monitoring of its pilots was so deficient, that the Pilots did not understand that their behavior was dangerous and inappropriate, SWA is liable for that failure. SWA is also independently liable for failing to properly investigate and discipline them. (*See Ford* and *Jordan, Supra*) It is independently liable for the harm caused by its decision to adopt he Pilots' "fake- joke" video scenario as its reason for protecting them instead of Plaintiff, for not disciplining them, but engaging in "retaliatory harassment" prohibited under Title VII.

The Court should take judicial notice of the fact that the use of such video devices has sharply increased since 2000 when the first cell phone with a video camera was marketed. In the last decade, small high-resolution cameras that could previously only be obtained and purchased by sophisticated intelligence and security services have become readily available from Wal-Mart, Best-Buy or on the internet. They can be connected to

CRONUS LAW, PLLC

CRONUS LAW, PLLC

portable computers, devices, cell phones and the internet. [5] Devices with these capabilities did not even exist 20 years ago. (*Id.*) *See also* Exhibit "B" But they are common now, as are the websites where the images obtained from such secret recording devices are displayed for prurient and financial purposes.  It is this new reality that the Court must consider in deciding this motion.

Multiple legal scholars and commentators have commented on the difficulty legislative bodies have had in comprehending the rapidly growing size and scope of the problem, and further in making statutory changes to fit these crimes and torts, be it in everyday life, or the workplace. But it is happening as legislators, regulators, law enforcement and the Courts have now recognizing both the nature of the threat, the serious and long-term harm to the victims of video voyeurism and are actively prosecuting perpetrators, civilly and criminally. [6]

---

[5] https://www.digitaltrends.com/mobile/camera-phone-history/

[6] e.g *See* Horstmen, Timothy, J. *Protecting Traditional Privacy Rights in A Brave New Digital World: The Threat Posed By Cellular Phone-Cameras And What States Should Do To Stop It.* 111 Penn St. L. Rev. 739, 2007; "Voyeurs have a new weapon in their assault on individuals' privacy. Armed with tiny cellular phones that now come equipped with increasingly powerful cameras, these technological Peeping Toms have left their hiding places in the shadows and entered the community, snapping inappropriate pictures of men and women in public places once assumed to be safe."  At P. 740 *See Also,* Danielle Keats Citron, *Sexual Privacy,* 128 Yale L.J. (2019).   https://digitalcommons.law.yale.edu/ylj/vol128/iss7/2   "Traditional   privacy   law's efficacy is eroding as digital technologies magnify the scale and scope of the harm. ***Thanks to networked technologies, sexual privacy can be invaded at scale and from across the globe. Search engines make the fruits of privacy violations easily accessible, 23 and in some cases, the damage can be permanent***." At pg 1877. [Emphasis supplied],[***Footnoted citations omitted]*** "A quick online search yields an array of inexpensive coat hooks, clock radios, and smoke detectors with hidden cameras. Perpetrators—often landlords, maintenance workers, roommates, and ex-intimates—place spy cameras in people's bedrooms and bathrooms. 220"

**F.      Plaintiffs' Good Faith and Fair Dealing Claim ("Bad Faith") is not covered by the Collective Bargaining Agreement**

SWA raises and discloses for the first time, an unauthenticated 243-page document that purports to be the Collective Bargaining Agreement ("CBA") that it claims governs whether the tort claim of "Bad Faith" is barred as a matter of law. The CBA has not been disclosed and cannot be independently verified to be what SWA claims it is or does. However, it is clear that CBA is but 1 of a series of documents that must be read together. (*See* Art. 3.2 which identifies other undisclosed documents, including "Company rules, regulations and orders previously or hereafter issued…" that together govern the relationship. Absent a complete set of employment documents, it is impossible to properly address or interpret the impact of the CBA has on SWA's duty to act in good faith. Further, as the CBA is outside of the four corners of Plaintiffs' Third Amended Complaint and its response, SWA's inclusion of this undisclosed, unverified document converts the motion to one for summary judgment under FRCP 56. The Court should therefore disregard the document in its entirety.

**G.      Plaintiff was targeted and not Protected Because of her Sex**

Defendants' claim that the Plaintiff did not plead that SWA allowed the Pilots to sexually harass, abuse, and that she was not discriminated against, as defined under Title VII is simply incorrect. (*See* TAC Paras. 34-36; 53; 160-167; 177-180) Plaintiff clearly

---

Ftnt 220 documents a list of recent invasions of privacy arrests and prosecutions for use of digital devices to secretly record individuals in bathrooms, hotel rooms and other places commonly thought of as "private" ***See Appendix "A" Summary of Electronic Peeping Tom Reports, Arrests and Cases.***

CRONUS LAW, PLLC

alleged a severe violation that is objectively outrageous, it is ongoing and has been ongoing since SWA allowed the Pilots to keep the images and devices. Plaintiff was targeted because of her sex and since the incident was reported, SWA has protected the male Pilots, who have not been punished, and attacked the female Plaintiff. (*Id.*)

Title VII is violated when the workplace is permeated with discriminatory behavior that is sufficiently severe *or* pervasive to create a discriminatorily hostile or abusive working environment, not both as claimed by SWA. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993) The standard requires an objectively hostile or abusive environment and the victim's subjective perception that the environment is abusive. Plaintiff has plead both. In *Harris,* the U.S. Supreme Court held that the broad language used by congress (terms, conditions, or privileges of employment)' "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment. (*Id.* At p. 21) Whether the environment is "hostile" and or "abusive requires the court to consider all the circumstances which "may" include frequency, but does include its severity and whether it is "humiliating" and actually affects the victim's ability to continue working. (*Id.)*

Defendants' motions ignore all the factors and addresses only the frequency of the misconduct, which it mischaracterizes. If, as alleged, SWA's Pilots watched and made secret recordings of Plaintiff as she was partially nude for their own gratification, by definition they are sexually harassing and abusing Plaintiff. That they did it to others on the flight is not a defense. Each time they watched the video its a separate act of

14

CRONUS LAW, PLLC

harassment. As SWA, in its zeal to protect the Pilots, left them in control of the devices and recordings, the harassment and hostile work environment is ongoing and approaching its 3rd year, as of today, the recordings are still unaccounted for. That they did not discriminate because they also filmed men, women and children is irrelevant until it is established what they did with the recordings. Only the Pilots know why they took videos, which ones they intended to watch later or what they did with them. While it is possible that they were equally thrilled by watching men and women, girls and boys undress, it is far more likely that they later shared or watched the ones which appealed to their particular sexual urges. Statistically, it is far more likely the two married Pilots watched and re-watched the women and girls.

This inference is supported by the Defendants' "Joke" video scenario. Although Flight 1088 had a male crew member on it, the Pilots did not target him. They targeted Renee, twice. It is therefore a reasonable inference that they picked her wholly or largely on the basis of her sex and that they knew SWA would protect them if caught because of their sex and powerful positions. That violates Title VII, because the initial and ongoing "…harassment [that] so altered working conditions as to "ma[k]e it more difficult to do the job." (*Id.* At Pg. 25)

This question of why she was chosen and for what purpose illustrates why discovery is needed. However, in deciding whether to grant the motion, the Court should consider the relevant studies and statistical evidence regarding who video voyeurs target and why, as well as the damage sustained by victims, as documented in multiple peer

reviewed journals and publications by legal scholars, medical researchers and treaters. As is noted by Danielle K. Citron, in her Yale Law Review article:

> "The relationship between sexual privacy and gender, racial, sexual, and economic equality is undeniable. Protecting sexual privacy involves a recognition of the disproportionate impact that sexual-privacy invasions have on women, sexual minorities, and nonwhites, and on [their] lived experiences and suffering… these invasions constitute unacceptable forms of subordination and discrimination.
>
> Victims of sexual-privacy invasions lose their jobs. They have difficulty finding work when their nude photos appear in searches of their names. They feel humiliated and demeaned after cameras secretly videotape them in bedrooms, bathrooms, or showers, and the footage is posted online without authorization. Sexual-privacy invasions deprive individuals of their sense of belonging and the recognition of their equal citizenship.

Without knowing where the videos went or what they were used for, this Court cannot say as a matter of law, Plaintiff was not harassed and/or discriminated against. Even under the "Joke" video scenario, the victim the Pilots' chose was Renee. When confronted, Russell told her to her face that she had been watched and recorded. Graham did not deny it. That she believed them is reasonable, foreseeable and actionable. Now SWA is punishing her for believing them and following its Polices.

## H.    The Alleged Fact Support Plaintiffs' Retaliation Claim

Retaliation occurs when an employer takes a materially adverse action because an individual has engaged in, or may engage in, activity in furtherance of the EEOC laws the Commission enforces. (42 U.S.C. § 12203). Retaliation is a low bar and broadly defined. Further, "It is well settled that the participation clause shields an employee from retaliation

16

regardless of the merit of his EEOC charge." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978). Thus, an employer who retaliates in any way against an employee who in good faith, makes a credible report to her employer of sexual harassment, sexual discrimination, or illegal conduct involving sexual misconduct and exploitation, especially of children, violates the law. The reports Plaintiff and her crew made were based on first hand observations and admissions by the Pilots.  Renee's fellow flight attendants all agreed that the conduct was inappropriate and must be reported, as SWA's agents who received the reports. The reports were, as a matter of law, protected activity and protected by the participation clause. Nevertheless, SWA immediately began a campaign of protecting its powerful male employees and retaliating against its subordinate female employee. (*See* TAC Paras 188-194)

Plaintiffs have plainly alleged that immediately after the reports were filed, David and Renee were subjected to, and have continued to be subjected to a coordinated campaign of harassment that includes being required to undergo an unusually high number of audits, "random" drug and alcohol screenings, encounters with management and auditors. (*Id.*) They have been followed secretly and SWA has undertaken a campaign to specifically discredit them in meetings with fellow SWA employees. This treatment by SWA and its agents, employees, officers, managers and servants are unlike anything that they have encountered in their combined 47 years as SWA flight attendants and constitutes retaliation and is a violation of the statute (*McGhee v. Healthcare Servs. Grp., Inc.*, No. 5:10cv279/RS-EMT, 2011 WL 818662; For further EEOC guidance, *See* Appendix "B" *EEOC Enforcement Guidelines § II. B. Materially Adverse Action*.

CRONUS LAW, PLLC

## I.    SWA is Not Allowed Attorneys' Fees for Plaintiffs' Claims

SWA can only recover attorney's fees if is prevails and it shows "exceptional circumstances" or that the claim was clearly frivolous and Plaintiffs knew it and continued to litigate anyway. *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir.1990); Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 422, 98 S. Ct. 694, (1978) Federal law strongly discourages awards of attorney's fees in cases involving reporting of sexual harassment and discrimination, even if the end result is a defense verdict and an fee award is limited to that incurred solely in response to the frivolous claims. *(Harris, Supra;* 631 F.3d at P. 971)

Inexplicably, SWA attaches the order of Judge Talamante dismissing Susan Martinez's claims against it in a state court claim she filed. [7]. The ruling in Martinez's case is irrelevant. The claims were framed differently and in different Courts.[8] They are, however, instructive on three points: 1) Judge Talamente did not award SWA any legal fees; 2) the Pilots' motion was denied, despite Martinez's inadequate two paragraph response; 3) Martinez is proceeding against the Pilots and has served a subpoena on SWA to produce evidence it has thus far withheld. (See Exhibit "C") SWA must comply and the forensic examination will resolve a key disputed factual issue.

---

[7] The complete pleadings, such as they are, are attached in Appendix "C". It will take the court but a few brief minutes to review the entire file and conclude that the pleadings should not impact its decisions here, except as stated above.

[8] Unlike Plaintiff, Martinez did not file an EEOC complaint. Martinez was not the person who was called into the cockpit by the pilots. Not only was her complaint cursory and lacking the detailed and specific factual allegations set forth in the Third Amended Complaint specific allegations, the three-paragraph response that Martinez's attorney filed was clearly insufficient to respond to SWA's 12b.6. Motion. Essentially, Martinez's attorney abandoned her claim, her and her case has been undertaken by new counsel

18

### III.     PLAINTIFFS' RESPONSE TO PILOT DEFENDANTS JOINDER

The above response adequately addresses most of the points Plaintiffs' wish to make against both the Pilots and SWA. For clarity's sake and to conserve time and resources, Plaintiffs' chose to address both the Motion to Dismiss and the Joinder in one pleading, rather than responding to the pleadings in separate documents. However, there are specific concerns regarding the Pilots which are briefly addressed below.

1.     SWA is not denying that the Pilots were employees, using its equipment and overseeing other employees. SWA and the Pilots are denying that the crimes observed by Plaintiff happened at all, this creates a factual dispute.

2.     At its heart, Defendants' joinder asks the Court to invade the province of the Jury, and without hearing any evidence, conclude that their "prank video" story is, in fact true and the Pilots' motives and intent were pure. They want the Court to ignore the binding admissions against interest that Russell made. In a moment of panic, he told Plaintiff that he and Graham were in fact recording people in the lavatory, that SWA approved of what they were doing and she would be in trouble with SWA if she reported them. Unfortunately, those statements turned out to be true, even if they were not all true at the time, he made them.

3.     The Pilots deny Plaintiff's specific allegations as to the extent of harm she has suffered because of their actions, words and subsequent deeds. They deny that she suffered any harm that could legally result from Plaintiff believing in good faith, that she was secretly recorded partially nude multiple times by two male superior officers she did

CRONUS LAW, PLLC

not know. Those images cannot be accounted for. And that is, perhaps, the most outrageous fact of all.

4.    The legal standard for Title VII sexual harassment requires only a showing of severe OR pervasive behavior, not severe AND pervasive conduct, as has been previously misstated. *Harris, Supra.*  Therefore, a single, unusually severe incident of harassment is sufficient to constitute a Title VII violation; the more severe the harassment, the less important it is to show multiple or repetitive incidents. *See Barrett v. Omaha National Bank*, 584 F. Supp, 22, 35 FEP Cases 585 (D. Neb. 1983), *aff'd,* 726 F.2d 424, 33 EPD ¶ 34,132 (8th Cir. 1984).  What could possibly be more severe than a female being surreptitiously filmed on video by her male supervisors, without her knowledge or consent, and in a place as private and intimate as a lavatory in which she engaging in purely private activities?

Pilots exercise absolute authority over the aircraft, crew and passengers, which is unheard of in most work place settings. They must be properly trained to use that power wisely. Obviously, either SWA failed at this task or they chose to ignore their training, confident that the airline would not discipline them, or even acknowledge their wrongful and intentional acts against a subordinate female employee. That points to a culture of arrogance and entitlement. In choosing Plaintiffs, who they did not know, the Pilots chose someone who respected rules, regulations, laws and authority. As such, she reasonably believed Russell's admission that they were recording people using the lavatory, even though she did not believe it was a SWA security initiative, and she acted accordingly. As a result, it is Plaintiff and her husband, not the perpetrators who have been harmed,

CRONUS LAW, PLLC

made ill, suffered mental and emotional distress and financial harm, while the Pilots have gone unpunished. Such harm demands an accounting and a remedy. Fortunately, Arizona law provides a remedy for both the Pilots and SWA's actions and Federal law provides a remedy for SWA's violations of Title VII. When taken together, Federal and Arizona Law require the motion be dismissed and the case proceed through discovery and to a trial by jury.

Wherefore, Plaintiffs respectfully request the Court Deny the Motion and Joinder in their entirety.

RESPECTFULLY submitted this 16th day of January, 2020.


**CRONUS LAW, PLLC**

By: _____
    Jeff Bouma
    Larry Cohen
    Joel Fugate
    2601 E Thomas Rd., Ste. 235
    Phoenix, AZ 85016
    *Attorneys for Plaintiffs*


**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of January, 2020, I electronically transmitted the foregoing with the Clerk of the Court using the CM/ECF system for filing, and copies were mailed to all counsel of record at the following addresses:

Ronald L.M Goldman
Diane Marger Moore
**BAUM HEDLUND ARISTEI GOLDMAN**
10940 Wilshire Blvd. 17th Floor

21

Los Angeles, California 90024
rgoldman@baumhedlundlaw.com
dmargermoore@baumhedlundlaw.com
*Attorneys for Plaintiffs*

R. Shawn Oller
Peter Prynkiewicz
**LITTLER MENDELSON, P.C.**
Camelback Esplanade
2425 E Camelback Rd., Ste. 900
Phoenix, AZ 85016
soller@littler.com
pprynkiewicz@littler.com
*Attorneys for Defendants Southwest Airlines, Co.*

Dominique Barrett
Lori Metcalf
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E Camelback Rd., Ste. 440
Phoenix, AZ 85016
dominique.barrett@qpwblaw.com
lori.metcalf@qpwblaw.com
*Attorneys for Defendants Terry Graham and Ryan Russell*

By: /s/ Christine Miller

22