**CRONUS LAW, PLLC**

Larry Cohen, AZ Bar No. 010192
Jeff Bouma, AZ Bar No. 011808
Joel Fugate, AZ Bar No. 031739
2601 E Thomas Rd., Ste. 235
Phoenix, AZ 85016
Phone: (480) 467-3188
Fax:    (480) 718-8575
lcohen@cronuslaw.com
jeff@cronuslaw.com
joel@cronuslaw.com
admin@cronuslaw.com
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Renee Steinaker and David Steinaker, a married couple;<br><br>      Plaintiffs,<br><br>vs.<br><br>Southwest Airlines, Co., a Texas Corporation; Terry Graham and Jane Doe Graham; Ryan Russell and Jane Doe Russell; Defendants XYZ; Corporations I-X; Black and White Partnerships I-X; and Does I-X Under Fictitious Names;<br><br>      Defendants. | Case No.: 2:19-cv-05022-SPL<br><br>**FOURTH AMENDED CIVIL COMPLAINT AND JURY TRIAL DEMAND**<br><br><br>*(Assigned to the Honorable Steven P. Logan)* |

Plaintiffs Renee Steinaker and David Steinaker ("Plaintiffs"), for their causes of action against Defendants Southwest Airlines Co., Terry Graham, Ryan Russell, Defendants XYZ, Corporations I-X, Black and White Partnerships I-X, and Does I-X Under Fictitious Names (collectively "Defendants"), allege:

/ / /

-1-

**PREAMBLE**

1.    This is a case where 1 of 2 scenarios occurred, both of which were intentional and harmed Plaintiff Renee Steinaker.

2.    The Pilots either:

A.    Intentionally installed a hidden camera in the bathroom of Flight 1088, watched and recorded the 3 female flight attendants, including Renee Steinaker, disrobing multiple times or:

B.    Intentionally created a "fake" video to use as part of a hazing ritual to make Renee Steinaker, and only Renee Steinaker, believe that they had been watching and had recording her to be naked, that it had occurred not just on this flight but on every flight she had been on, and that she would be punished and disciplined if she told anyone about what they were doing. The actions of the pilots in the cockpit where the hazing prank was performed were designed to, and in fact did, make Renee Steinaker believe that she had been watched and that Defendant Ryan Russell in particular was treating her as an inferior based on her gender and looks.

3.    If it was scenario "A", the Pilots are liable to Renee Steinaker for committing a federal and state criminal act against her, and others, by creating a hostile workplace for Renee Steinaker and the rest of the flight attendants at Southwest, the vast majority of whom are female. This behavior targeted all women working for Southwest, but impacted Renee Steinaker the most because she is the employee who discovered the illegal activity, reported it, and has been subjected to further unlawful harassment and retaliation since.

4.    Alternatively, if it was scenario "B" the Pilots deliberately targeted Renee Steinaker because of her gender. They deliberately created a fake video months earlier, waited until the day of Flight 1088 to see it, and then tried to convince Renee Steinaker that she and the other women were being spied on.

5.    Under either scenario, Southwest is vicariously liable to Renee Steinaker for the Pilots intentional actions.

6.    The additional allegations set forth in the Fourth Amended Complaint ("FAC") are

all relevant specifically to Count1 (previously Count 6) because of the set forth facts:

A.     That the gender mixture of the flight attendants crew (3 females v. 1 male), their assignments (front v. rear) and the culture of Southwest's pilots made it highly likely that the female attendants would be seen by the camera/iPad combo employed by the pilots under scenario A and that it was assured that it would be a female attendant that would come to the cockpit to be hazed under scenario B. (*See* FAC ¶¶ 16-31; 35, 36; 103-111)

B.     That there is a well-known and recognized culture at Southwest of sexual harassment, discrimination and hazing of female flight attendants in the cockpit during flights. (*See* FAC ¶¶ 32-34)

C.     That describe in detail the events, verbal and non-verbal interactions that occurred during her first encounter with First Officer Ryan Russell, where she saw (or was shown) the video and subjected to unwanted discriminatory and harassing looks, words and conduct that caused her significant discomfort, stress, emotional and mental distress because of her gender, (*See* FAC ¶¶ 37, 38, 43-90; 95-101) and which negatively affected the working relationship between herself, the captains, the crew and denied her the ability to perform her duties as an equal and respected member of the flight crew. (*See* FAC ¶¶ 91-101; 107-111;129-144; 146-167; 207-239)

D.     That describe in detail the events that occurred during her second encounter in the cockpit when she was required to be alone with Captain Terry Graham and was subjected to the same story, warnings and threats made by Ryan Russell, which negatively affected the working relationship between herself, the captains and crew, and denied her the ability to perform her duties as an equal and respected member of the flight crew. (*See* FAC ¶¶, 114 -129, 128; 129-165; 207-239)

E.     That describe in detail the unsafe actions and violations of FAA and Southwest safety protocols, policies and procedures that were either actual signs of fear and panic by the pilots, or were an elaborately planned and staged hazing prank that was intentionally so risky and convincing that Renee believed (and still believes) that she and other female attendants were filmed and watched by the Pilots (*See* FAC ¶¶ 91-94; 113,

CRONUS LAW, PLLC

127-137; 154-161; 166-168)

F.   That describe in detail the effect of the pilots' hazing of her based on her gender and the culture at Southwest that allowed the male pilots to act as they did, knowing that Southwest's management would not investigate the female subordinates' complaints. (*See* FAC ¶¶ 21-36; 46-53; 75-90; 95-100; 134-137; 154-161,163,164, 237-239)

G.   That describe in detail Southwest's own acts and assistance in covering up the spying and/or hazing to protect the male pilots at the female flight attendants expense and its attempts to intimidate and discourage Renee Steinaker from reporting the incident to internal security, her husband, the FAA, appropriate law enforcement agencies and the EEOC. (*See* FAC ¶¶ 207-236)

H.   That describe in detail the report that was filed, the reactions of the managers who received the report of the incident, their acknowledgement of the egregiousness of the conduct, the emotional harm it caused, and their decision to treat the incident as an intentional harassment claim instead of following the mandated procedure that would be used for non-intentional, physical workplace claims. (*See* FAC ¶¶ 134, 145, 181-206)

## JURISDICTION, AND VENUE

7.   Plaintiffs make the following general allegations:

a.   Plaintiffs are residents of Maricopa County, Arizona.

b.   Both Plaintiffs are and were flight attendants for Southwest Airlines and qualified as employees as defined in 42 U.S.C. §2000e(f).

c.   Defendant Southwest Airlines, Co. ("Southwest Airlines") is a Texas corporation conducting business in Maricopa County, Arizona.

d.   At all relevant times, Defendant Southwest Airlines continuously employed more than fifteen (15) employees and qualified as an employer as defined in 42 U.S.C. § 2000e(b).

e.   Defendants Terry Gene Graham ("Graham" or "Captain") and Jane Doe Graham reside in Lantana, Denton County, Texas and, at all relevant times herein, Graham was acting in furtherance of and for the benefit of their marital community.

CRONUS LAW, PLLC

f.      Defendants Ryan Russell ("Russell" or "First Officer") and Tara Russell reside in Flower Mound, Denton County, Texas and, at all relevant times herein, Russell was acting in furtherance of and on behalf of their marital community.

g.      At all times pertinent to the allegations of this Complaint, Graham and Russell were licensed pilots, operating federally licensed aircraft owned and operated by Southwest Airlines, and were acting in furtherance of the business of Southwest Airlines in the course and scope of their employment.

h.      Plaintiffs have sued Defendants XYZ, Corporations I-X, Black and White Partnerships I-X, and Does I-X under fictitious names. Plaintiffs are informed and believe that said Defendants are in some way responsible for the acts complained of herein. When their true identities have been ascertained, Plaintiffs will seek leave of Court to amend the Complaint.

8.      Defendants have committed actions and caused events to occur in Maricopa County, Arizona, which are the foundation of this action and out of which this action arises. Accordingly, both jurisdiction and venue properly lie with the Arizona District Court.

9.      The following allegations have been admitted by Defendant Southwest Airlines:

a.      Plaintiffs are residents of Maricopa County, Arizona.

b.      Plaintiffs, and each of them, are experienced, senior flight attendants who have each been working for Southwest Airlines for over 20 years.

c.      Defendant Southwest Airlines is a Texas corporation conducting business in Maricopa County, Arizona.

d.      Defendant Captain Terry Graham was a licensed pilot employed by Southwest Airlines. He was armed with a firearm pursuant to his position as a Federal Flight Deck Officer ("FFDO"). *See* 49 U.S.C. § 44921.

e.      Defendant First Officer Ryan Russell was an employee of Southwest Airlines.

10.     The following allegations have been admitted by Defendants Graham and

Russell:

    a.    Defendant Southwest Airlines is a Texas corporation conducting business in Maricopa County, Arizona.

    b.    Graham resides in Lantana, Denton County, Texas. At all times relevant hereto, Graham was a licensed pilot employed by Southwest Airlines and was armed with a firearm pursuant to his position as a FFDO.

    c.    At all times material, Russell was a duly licensed pilot and an employee of Southwest Airlines residing in Flower Mound, Denton County, Texas.

    d.    Jurisdiction and venue properly lie with the Arizona District Court.

**(Jury Demand)**

11.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and all Defendants have demanded a jury trial on all triable issues.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**(Uncontested Allegations)**

12.    The following uncontested allegations have been asserted by Plaintiffs and admitted by all Defendants in their answer to Plaintiffs' Amended Complaint.

13.    On February 27, 2017, at approximately 12:55 p.m., Southwest Airlines Flight 1088 departed Pittsburgh, Pennsylvania on a non-stop flight to Phoenix, Arizona.

14.    The aircraft was N8658A, a Boeing 737-800 commercial airliner. The aircraft had both forward and aft lavatories for use by the passengers and crew.

15.    Graham and Russell, Captain and First Officer respectively, were commanding Flight 1088.

16.    The remaining crew members consisted of four flight attendants ("Flight Attendant"). Three were female: Renee Steinaker, Susan Martinez, ("Martinez") Sandie Pietz ("Pietz") and one was a male: Larry Jackson ("Jackson")

17.    Each Flight Attendant had a designated "position" which determined their specific responsibilities. Renee Steinaker was designated as position "D" and is referred to as "Flight Attendant D" or "D Flight Attendant" in some Southwest Airlines reports.

-6-

18.     Martinez was in position "A" at the front of the aircraft, Jackson was in "B" stationed at the rear of the aircraft, with Renee Steinaker and Pietz, who were in position "C", also stationed at the front of the aircraft.

19.     Approximately two hours into Flight 1088, Captain Graham requested that a flight attendant come forward so that he could use the lavatory. This was consistent with airline protocol, requiring that two persons be in the cockpit at all times.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### (Contested Allegations)

20.     The following contested allegations are asserted by Plaintiffs in support of their claims in Plaintiffs' Fourth Amended Complaint

21.     75% of the Flight Attendant's on the flight were female.

22.     100% of the Flight Attendant's stationed near the cockpit were female.

23.     The lone male Flight Attendant, Jackson, was stationed at the back of the aircraft.

24.     Jackson is a large man, standing approximately 6'2" or 6'3" and weighing between 235-245 lbs.

25.     Southwest culture and custom dictate that the female flight attendants are expected to respond to the Pilot's call for a flight attendant to come to the cockpit.

26.     Southwest culture is based in part on security concern and protocols and the limited space on the 737-800 series aircraft where the cockpit, forward galley and lavatory are located.

27.     Those protocols require that four crew members be in the forward galley, lavatory and cockpit during the change in personnel: the 2 pilots, a flight attendant to replace a pilot in the cockpit, and a flight attendant to "guard the galley", restroom and cockpit entrance.

28.     A man the size of Jackson does not fit comfortably in the forward galley, lavatory and cockpit entrance area with the two male pilots.

29.     However, the generally smaller female flight attendants take up less room

-7-

and make moving around, entering and exiting easier for the Pilots and crew.

30.   Additionally, Southwest's Pilots have made it known, through numerous statements and actions over the 20 plus years that Plaintiffs have worked for Southwest, they do not like it when male flight attendant responds to the call to come to the cockpit.

31.   Rather Southwest's Pilots have made it known, through numerous statements and actions over the 20 plus years that Plaintiffs have worked for Southwest that they want and expect female flight attendants to come to the cockpit.

32.   Consistent with Southwest culture, female flight attendants who answer these calls have been subjected to systematic harassment based upon their gender.

33.    Renee Steinaker and other female flight attendants have also been asked to participate in an "initiation." This "initiation" involves a Captain requesting a flight attendant to "bare their breasts" on occasions where a First Officer is making his or her first flight as a Southwest Pilot. Indeed, Defendant Russell has propounded a Request for Admission on this very point. (*See*, Exhibit 1, Defendant Russell's RFA #4 and Plaintiff's Response)

34.   Renee Steinaker herself has been requested to participate in the "initiation" ritual described in the discovery propounded by Defendant Russell, but has refused on each and every occasion. (*Id.*)

35.   At the time, Graham and Russell requested a flight attendant to come to the cockpit, given the make-up of the crew and their assignments, they knew that the likelihood that one of the female flight attendants would respond were 75% or higher.

36.   At the time, Graham and Russell requested a flight attendant to come to the cockpit, given the make-up of the crew, their assignments and Southwest's culture, they knew that the likelihood that the male flight attendant, Jackson, would respond was virtually zero.

37.   Plaintiffs allege, and Graham and Russell admit, that it was, in fact, Renee Steinaker who responded to the direction of the Captain and reported to the front of the aircraft.

-8-

38.     Renee Steinaker entered the cockpit after Graham exited and was alone with F.O. Russell.

39.     The Southwest 737-800 series aircraft used as Flight 1088 is equipped with a cockpit voice recorder that records all conversations, command, transmissions from crew and other noises in the cockpit for at least a two-hour period before it records over itself.

40.     Many Boeing 737-800 series aircraft have replaced tape-based cockpit voice recorders with digital recorders that record and store multiple hours of cockpit noises and conversations.

41.     The conversations between Renee Steinaker and the pilots, and the pilots themselves, were recorded by the cockpit voice recorders.

42.     All or part of the events at issue here were still available to be downloaded and preserved once Flight 1088 landed in Phoenix, Sky Harbor Airport, yet Southwest failed to preserve any of this evidence.

43.     When Renee Steinaker entered the cockpit, she was wearing an approved Southwest flight attendant uniform consisting of a blouse, work dress, nylons and heels. She had on make-up and was wearing her hair down.

44.     As is customary, the only employees in the cockpit were Renee Steinaker and F.O. Russell.

45.     Russell was seated in the First Officer's chair on the right side of the aircraft.

46.     Russell was looking forward and as Renee Steinaker entered the cockpit, he turned his head and looked her "up and down" before turning away.

47.     Russell was not wearing an oxygen mask, as required by FAA regulations.

48.     Renee Steinaker could see Russell's face, mouth and eyes.

49.     Renee Steinaker said, "Hey", but he did not respond verbally.

50.     Russell again turned to look at Renee Steinaker, this time staring hard as she watched his eyes travel up and down her body.

51.     During this second interaction, Russell looked intently at her breasts for an unusually long time.

-9-

52.     At no time during this interaction did Russell speak to Renee Steinaker or look at her face.

53.     Russell's behavior made Renee Steinaker very uncomfortable.

54.     Renee ignored Russell's leering, sat down in the jump seat, carefully crossed her legs in her work dress and looked around the cockpit.

55.     Plaintiffs allege, and Graham and Russell admit, that when Renee Steinaker entered the cockpit, Graham's iPad was mounted on the windshield to the left of the Captains seat.

56.     The iPad was visible to anyone in the cockpit, including Graham, Russell, and Renee Steinaker.

57.     Plaintiffs allege, and Graham and Russell admit, that Renee Steinaker saw Graham's iPad which was mounted to the left of the Captain's chair.

58.     There was also an iPad mounted on a bracket to the right-side window adjacent to First Officer Russell's seat which upon information, custom and belief, was placed there by Russell.

59.     Both Graham and Russell could see each other's iPads from their respective seats.

60.     The iPads were required to be in the cockpit by Southwest Airlines to aid the pilots in safely operating the aircraft by providing flight and safety related information such as navigation, schedules, weather information, etc.

61.     The layout of the cockpit is such that the Captain's seat is on the left side of the cockpit and the First Officer's seat is on the right. The "jump seat" used by flight attendants is immediately behind the Captain's seat.

62.     When Renee first looked at the iPad adjacent to Captain Graham's chair, it was blank. The cockpit jump seat shares a common wall with the forward lavatory of the 737-800 series aircraft, such that the person sitting in the jump seat can hear the activities of people in the lavatory.

63.     After Graham left the cockpit and entered the lavatory, Renee Steinaker

heard Graham open the door and enter the lavatory.

64.     Simultaneously the iPad's previously blank iPad screen was activated, showing Captain Graham in the bathroom and closing the door.

65.     Renee Steinaker was able to positively identify the person seen on the iPad video to be Graham because she could see his face, torso, and hair.

66.     Renee Steinaker was able to identify the location where Graham was on the iPad video as the forward lavatory of Flight 1088.

67.     The forward lavatory of the aircraft on Flight 1088 does not contain a changing table.

68.     Renee Steinaker heard Graham close the door and use the bathroom in the lavatory while simultaneously observing images of Graham on his iPad.

69.     The sounds she heard behind her perfectly matched the images of Graham's movements on Graham's iPad.

70.     When Graham finished and left the lavatory, Renee Steinaker heard the lavatory door close.

71.     Within seconds, the iPad screen went blank again.

72.      The manner in which the iPad images started and stopped were consistent with Renee Steinaker's understanding of how a motion-detector camera being used to record and transmit images to the iPad would be used.

73.     Plaintiffs allege, and Graham and Russell admit, that Renee Steinaker immediately asked Russell whether the iPad was live streaming from a camera in the forward lavatory.

74.     Specifically, Renee Steinaker asked Russell: "Is this a livestream?"

75.     With a panicked look on his face, Russell said: "Oooh…he forgot to turn the camera off. I don't think he still knows that it is on!"

76.     As he said this, Russell abruptly sat in his chair and blocked Renee's view of the iPad to his right.

77.     It appeared to Renee Steinaker that Russell was trying to shield her view of

CRONUS LAW, PLLC

his iPad.

78.     Renee Steinaker responded: "Are you f**king kidding me? We have cameras in our lavatories?"

79.     Russell again admitted the video image was a live stream from a secret camera, saying "This is on the down-low, it's for security".

80.     Russell continued to assert to Renee Steinaker that the camera was part of a new, top-secret security initiative by Southwest Airlines, and cameras had been intentionally installed in the lavatories on all of Southwest Airlines' 737-800 series aircraft and implied that they could be anywhere, including in the galleys and even the cockpit.

81.     Russell made several fumbling attempts to justify the use of secret cameras by claiming that Emirates Airlines used them on its planes, even putting them on passenger seats.

82.     When asked specifically by Renee Steinaker if Emirates Airlines also put them in the lavatories, Russell admitted he did not know.

83.     Renee Steinaker also told Russell that his story sounded suspicious because Southwest had new uniforms for female Flight Attendants that would require them to wear body stockings and female flight attendants using the lavatories would be required to remove their tops and body suits, exposing their breasts, torsos, genitalia and buttocks to the cameras and to the pilots watching them.

84.     Russell grinned at Renee Steinaker and said sarcastically: "So you don't like the new uniforms?"

85.     Russell's smirk and lack of concern about her fears of being unable to perform her job duties for Southwest without being turned into an unwilling stripper for the pilots amusement each time she flew were degrading to Renee Steinaker.

86.     Russell's statements were intended to convey, and did convey, that the concerns of the female flight crew members about being the victims of video voyeurism were not a concern to him, Graham or Southwest.

87.     Russell again warned Renee Steinaker not to say a word to anyone about the

cameras or the recording.

88.     Russell told Renee Steinaker that the camera had been so well hidden in the lavatories, no one would be able to find them.

89.     This statement made Renee Steinaker fearful that she had, in fact, been the victim of video voyeurism by Southwest's male pilots not just on Flight 1088, but multiple past occasions, and would continue to be an unwilling victim on future flights.

90.     These statements and warnings made Renee Steinaker feel like she was powerless to stop the male pilots of Southwest from treating her, and other female flight attendants, as mere sex objects for their amusement.

91.     This conversation took several minutes during which time Renee Steinaker was able to continually hear and see Captain Graham in the lavatory.

92.     Although he was the only pilot in the cockpit of the passenger flight, during the several minutes he was engaged in trying to convince Renee Steinaker that the cameras were a legitimate airline safety program and that she was not allowed to know about or reveal it, Russell was focused entirely on Renee Steinaker and Grahams iPad.

93.     During this confrontation, in violation of FAA and Southwest safety regulations and policies, Russell was not wearing his safety belt or oxygen mask, monitoring the aircraft's instruments or communications. He was not even looking forward in the direction the aircraft was flying.

94.     Given Russell's position in the cockpit, he would have been unable to respond to an emergency requiring an immediate change of direction, speed or altitude, and would not have been able to safely respond to a sudden drop in aircraft pressure, oxygen levels, turbulence or altitude.

95.     Renee understood that this was a highly unusual, and dangerous, behavior for a pilot alone in the cockpit with only a flight attendant.

96.     Given her knowledge of Southwest's policies, procedures and safety practices, Renee Steinaker was shocked by Russell's explanations and justifications and knew that they were not plausible or consistent with them.

97.     Renee Steinaker knew, based on her 18 years of experience as a flight attendant for Southwest, that she needed to have documentation of these events so her report could be substantiated, not denied as "fiction" and taken seriously.

98.     She decided to document what was occurring on the iPad in the cockpit by using her cell phone to take a picture of the video image of Captain Graham in the forward lavatory of the Flight 1088. [ *See*, Exhibit 2, Photo taken by Renee Steinaker on February 27, 2012]

99.     Renee Steinaker advised Russell that she was taking a photograph to document her observations and would be reporting what occurred and her observation of the iPad live stream to Southwest Airlines.

100.     While arguing with Russell, Renee Steinaker was visibly "livid".

101.     Her hands were shaking as she pulled out her camera.

102.     Graham spent so much time in the bathroom that Renee Steinaker was able to wait for the opportunity to take a picture of Graham, that did not expose his face or other sensitive body parts, and thereby enable Graham to accuse her of misconduct.

103.     Renee then showed the picture on her phone to Russell and informed him that she would be giving it to Southwest with her report.

104.     After that, Russell became silent.

105.     After Graham finished using the lavatory and entered the cockpit, Renee Steinaker remained in the forward "galley" per First Officer Russell's statement that he would be using the lavatory next.

106.     It is customary that the flight attendant who was in the cockpit when one Pilot needed to leave the cockpit would again go into the cockpit when the 2nd Pilot left, unless her duties required her to leave the area.

107.     Both Pilots would be aware of this custom and would have known that Renee Steinaker would be the flight attendant who returned to the cockpit unless they requested another flight attendant to take her position.

108.     Pursuant to regulations and Southwest Airlines' policy, Susan Martinez was

-14-

also in the galley area to help "guard" the cockpit/lavatory door area while the personnel changes took place.

109.     During the interval when Graham and Russell were alone in the cockpit, Renee Steinaker began to tell Martinez what she had seen, whispering that there were cameras in the lavatory. She explained she heard the Captain in the lavatory and could simultaneously see him on the iPad mounted on the windshield to the left of his chair.

110.     Approximately one minute later, the cockpit door opened, and Russell emerged, and directed Renee Steinaker, not Martinez or the other two flight attendants, to re-enter the cockpit where Graham was piloting the aircraft, even though Renee was visibly upset.

111.     Russell was also visibly upset and panicked as he came out of the cockpit.

112.     His behavior has been repeatedly described by both Martinez and Renee Steinaker as looking like a "deer in the headlights".

113.     Despite her trepidations about re-entering the cockpit alone, Renee Steinaker complied with her duty and the FAA regulations requiring two airline crew to be in the cockpit at all times.

114.     When Renee Steinaker re-entered the cockpit, Graham was seated in the left-hand seat where the livestreaming iPad was located.

115.     Graham was not wearing an oxygen mask.

116.     He would not look at Renee Steinaker or make eye contact.

117.     Renee Steinaker confronted Graham stating "There are cameras in the lavs?".

118.     Graham responded by immediately lunging towards his iPad and using his arm to block her view.

119.     Graham tried to change the subject, asking her where was she based.

120.     Renee Steinaker replied "Phoenix, born and raised" and then asked Graham if they had cameras in the cabin.

121.     Graham responded that he did not know.

122.    As required and in conformance with Southwest Airlines' policy, Renee Steinaker remained in the cockpit alone with Graham until Russell returned, but stayed as far away from him as physically possible.

123.    Despite making multiple attempts to see the iPad, Graham refused to allow Renee Steinaker to look at it and refused to show her the video and images on it.

124.    During the approximately 2-3minutes that she was alone with Graham, he looked frightened, angry, and concerned.

125.    Instead of speaking in the clear voice he had used during the flight, he mumbled and spoke in a monotone. His answers were often impossible to understand and he refused to directly respond to Renee Steinaker's questions regarding the iPad, livestreaming/recordings, and secret security measures.

126.    This was a complete change of personality from the person he had been during the flight, his departure to the bathroom and when re-entering the cock-pit.

127.    Graham did confirm she was not supposed to know about the cameras and that she would get in trouble if she told anyone she knew about them or about what had happened.

128.    Grahams actions, words and deeds were so inconsistent with his personality and demeanor, Renee was convinced that she had caught them doing exactly what Russell claimed they were doing: Livestreaming video from a secret camera that was in the bathroom which she had repeatedly and extensively used before being summoned to the cockpit.

129.    Renee Steinaker believed that the Russell and Graham's explanations were not plausible and she repeated her intent to file a report regarding their misconduct.

130.    Southwest's Policy 4, prohibits employees from engaging in "Workplace Bullying and Hazing":

> "Hazing is defined as **initiations, pranks,** or other jokes initiated by one or more Employees **which produce mental or physical discomfort, embarrassment, and/or ridicule.** Workplace bullying is defined as **malicious, unwelcome,**

and/or severe mistreatment **that harms, intimidates, offends, degrades, or humiliates an Employee or specific group of Employees.**

[*See*, Exhibit 3, Southwest Policy 4]

131.    Southwest Policy 19.5 prohibits employees from secretly recording other employees without their knowledge or consent:

> For operational, compliance, and/or regulatory purposes, some departments (e.g., Crew Scheduling, Employee Relations, Benefits) are authorized to utilize recorded lines in the ordinary course of business. Except as approved by the Company **the use of a recording device by any individual Employee or Leader to record conversations or video conduct regarding work-related, performance, disciplinary issue, or any other conduct without the permission of all involved parties is prohibited.**

[*See*, Exhibit 4, Southwest Policy 19.5]

132.    Southwest Policy 3.1, prohibits employees from engaging in sexual harassment, discrimination or retaliation:

> **Southwest Airlines prohibits any and all types of harassment, sexual harassment, discrimination and/or retaliation against Employees by Leaders, fellow Employees**, … based on race, color, ancestry, religion, age, **sex,** sexual orientation, gender, gender expression, gender identity, pregnancy, marital status, national origin, physical or mental disability, military and veteran status, genetic information, medical condition, **or any other legally protected status, negatively affects morale, motivation, and job performance. Such behavior is inappropriate, offensive, and will not be tolerated.**

[*See*, Exhibit 5, Southwest Policy 3.1]

133.    Southwest Policy 5.3, prohibits Workplace Violence. Examples of workplace violence include:

- -Committing acts motivated by or related to Sexual Harassment or domestic violence

-17-

● -Making threats on social media sites such as Facebook, Twitter, Snapchat, etc. [*See*, Exhibit 6, Southwest Policy 5.3]

134.     Southwest's Policies 4, 5.3 and 5.6, (Alleged Criminal Activity at Work or Work-related Event) require and/or encourage employees who have witnessed or been victims of hazing, discrimination, harassment and criminal behavior to report those activities immediately to management and, if depending on the threat of harm, to call a supervisor, airport police, internal security or 911.[1] [*See*, Exhibit 7 Southwest Policy 5.6]

135.     Graham and Russell knew or should have known that Renee Steinaker not only intended to, but was required to report the incident to Southwest.

136.     Graham knew, or should have known, that Southwest would have to take some action to investigate, if a report was filed, and that a finding that he and Russell had spied upon Renee Steinaker, and others, he would have potentially serious career limiting or ending consequences, including, a possible referral to law enforcement.

137.     Nevertheless, despite more than adequate time to do so, neither Graham nor Russell told Renee Steinaker or any crew member that the video was a joke or prank.

138.     At no time did Graham or Russell ask Renee Steinaker, any member of the

---

[1] In her initial email/report SWA supervisor Deb Edwards states that, based on what the Flight Attendants reported, she should have called the police herself to detain the pilots and keep them from leaving Phoenix Sky Harbor airport after her attempts to get the Pilots pulled from the next flight failed: "*I let her [Renee] know this was being taken very seriously and that the Pilots would be replaced in BNA and this would be fully investigated. I also told her our Director was being informed and to be reassured they would be held accountable.*
*Dave called and gave Mike the information. We discussed that **it would have been better to have them removed from the flight they were on** and how we could have had them removed.*
***I called Mike Sims at 1804 local time and told him I should have just called the police since we didn't have a local Chief Pilot available to pull them from their flight.*** I asked if it would be possible to have their flight met when they landed in BNA so that the local authorities could have the iPad in their custody and search for the camera that the Captain had used. Mike said he was contacting Sonya our VP and was making sure that the proper steps would be followed*
[*See*, Exhibit 8, Email from SWA Supervisor Deb Edwards dated Fed. 27, 2017.]

Flight Attendant crew or the supervisors on the ground in Phoenix to whom the report would be made upon landing to view the iPad containing the video to confirm that it was not "real".

139.    No one but Graham and Russell had access to or used the lavatory during the time period in question.

140.    After Russell returned to the cockpit, Renee Steinaker was allowed to leave. She immediately shared her observations with Susan Martinez and her fellow flight attendants and showed them the photograph that she had taken on her phone of the iPad with Graham in the forward lavatory.

141.    Renee Steinaker understood that she had witnessed disturbing and improper conduct that violated Southwest Airlines' policies.

142.    Renee Steinaker understood that Russell's failure to concentrate on flying the aircraft during the confrontation adversely affected the safety operations of the aircraft.

143.    Renee Steinaker understood that the use of a hidden camera in a bathroom to record fellow employees and passengers constituted criminal and/or unlawful conduct.

144.    Renee Steinaker understood that the events that had just occurred violated Southwest's policies and procedures and constituted sexual harassments. [*See*, Exhibit 9, "Southwest Airlines' Policy Concerning Harassment, Sexual Harassment, Discrimination & Retaliation"]

145.    In its March 6, 2017 Letter of Counseling, Southwest admitted that Grahams actions in making Renee Steinaker believe she had been subjected to illegal and surreptitious videotaping by the pilots could be interpreted as "Harassment, Sexual harassment, Discrimination and Retaliation":

> On March 6, 2017, Base Manager Bob Dombrowski and I met with you and Southwest's Representative, Tom Ferriso, to discuss an incident that occurred on February 27, 2017, while you were the Captain in Command of Flight #1088 PIT-PHX. It was confirmed that, during that flight, you utilized your EFB to display a video to a Flight Attendant suggesting that you were being videotaped while using the lavatory on the plane.

-19-

CRONUS LAW, PLLC

**The Flight Attendant was led to believe that cameras were installed in the aircraft lavatory. This was upsetting and frightening to the Flight Attendant**. While you stated that this was a hoax by you and your First Officer, you never clarified or explained this to the Flight Attendant.

Not only was this prank in poor taste, but it was a misuse of your EFB on the Flight Deck in flight as outlined in AOM 3.16.1. **Additionally, you should be mindful that your actions could be perceived as a violation of company policy, including Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination & Retaliation.**

[*See*, Exhibit 10, Signed Letter of Counseling dated March 6, 2017.]

146.     Renee Steinaker understood that, per Southwest Airlines' policies, she was required to report what she had observed to her superiors at Southwest Airlines and to provide the photographic evidence on her phone and that failure to do so would be grounds for discipline.

147.     Renee Steinaker understood that reporting Graham and Russell's conduct would likely result in significant adverse action being taken against them by Southwest Airlines and, potentially, other agencies, including law enforcement.

148.     Renee Steinaker also knew that reporting, or even threatening to report misconduct by a Pilot would likely result in denials, retaliation, damage to her reputation and career.

149.     Renee Steinaker understood that, while she was required to immediately report the events to her supervisors, if she did not provide proof of her claims, they would not be taken seriously.

150.     Renee Steinaker understood that, in addition to the picture she had taken, additional evidence of what had occurred existed on Graham's iPad and the cockpit voice recorder, as well as potentially other sources, such as the flight data recordings, and Pilot's other devices, such as iPad and cell phones.

-20-

151.    The flight attendants also understood the significance of the events that had just occurred

152.    All four flight attendants discussed what had occurred including the Pilots claims and warnings of retaliation if they disclosed what had happened.

153.    The flight attendants conducted their discussions in whispers to both avoid alarming the passengers and to avoid being overheard by the pilots, who can listen in to crew conversations by activating the communications devices over the crew jump seats in the forward and aft galleys.

154.    The Fight Attendants also searched all the lavatories in the aircraft looking for hidden cameras or places spy cameras could be hidden, but did not find any cameras.

155.    The flight attendants agreed that the incident needed to be reported immediately and that they should seek guidance from Southwest Airlines' management and their union as to how to handle the situation.

156.    Renee Steinaker, during the flight, attempted to email a report to Southwest Airlines' management in Phoenix, but discovered that the on-board Wi-Fi system, which had previously been functioning, was no longer operational.

157.    Passengers on the flight who had been using the WiFi noticed that the system was no longer working and complained.

158.    Passengers on Southwest flight must pay for the use of the WiFi.

159.    When the WiFi does not work, or cuts off in mid-flight, it is customary for the Captain or crew to make an announcement, explaining the problem.

160.    It is also customary for the captain or crew to explain that the passenger's WiFi fees would be reimbursed.

161.    After the WiFi system ceased functioning on flight 1088, neither the flight attendant crew, nor the passengers were informed of the cause by the Captain or First Officer.

162.    After the WiFi system ceased to function the passengers were not told their fees would be refunded by either the Captain or First Officer.

163.     Upon information and belief, Graham and/or Russell intentionally disabled Flight 1088's Wi-Fi system to prevent Renee Steinaker and the rest of the crew from communicating with, and reporting the incident to, Southwest Airlines' management and the flight attendant union prior to Flight 1088's arrival at Sky Harbor International Airport.

164.     Throughout the remainder of the flight, rather than being focused on the safety and security of the passengers and the aircraft, the flight attendants were distracted with deciding what to do about the incident, determining whether there were any hidden cameras on board, attempting to contact management and union representatives to report the incident, and getting advice on how to proceed once the aircraft touched down.

165.     During the remainder of the flight, Renee Steinaker became fearful that Graham and/or Russell would attempt to physically take her cell phone away from her before the photograph could be shared with management, which would undermine her credibility.

166.     Renee Steinaker feared that, if she attempted to report the incident without the photograph, Graham and Russell would deny that the entire incident had ever occurred.

167.     To preserve the evidence, immediately upon landing and regaining cell phone reception, Renee Steinaker emailed a copy of the picture to herself.

**(THE PILOTS FLEE THE PLANE, LEAVING AN UNSECURED FIREARM IN AN OPEN COCKPIT WHILE THE FLIGHT ATTENDENTs FILE THEIR REPORT)**

168.     Upon information and belief, upon their arrival in Phoenix, both Graham and Russell immediately disembarked, leaving the aircraft unattended by either the Captain or First Officer. This was both extremely unusual and a violation of safety and security protocols, as understood by Renee Steinaker.

169.     Upon information and belief, Graham and Russell took their iPads off the aircraft with them when they fled the aircraft.

170.     When Graham abruptly left the aircraft, he left his loaded firearm unsecured and unattended in the cockpit, in violation of Federal Aviation Administration ("FAA")

CRONUS LAW, PLLC

regulations.

**(RENEE STEINAKER AND HER CREW IMMEDIATELY REPORT THE INCIDENT TO HER SUPERVISORS WHO CONFIRM THE SERIOUSNESS OF THE INCIDENT AND ACKNOWLEDGE THE MENTAL AND EMOTIONAL TRAUMA CAUSED BY THE PILOTS' ACTIONS)**

171.     As soon as she was able to disembark in Phoenix, Renee Steinaker and other crew members reported the events of the flight and livestreaming incident to Southwest Airlines' managers, Deborah Edwards, (Base Manager) and Dave Kissman (Regional Manager).

172.     The initial reports documenting the incident, subsequent abnormal behavior by the pilots noted by both Renee Stainaker and Susan Martienz were provided verbally on February 27, 2017 and detailed written incident reports were provided the following day. [*See*, Exhibit 11, Renee Steinaker's I.R. report and Exhibit 12 Susan Martinez I.R. report. *See Also,* Exhibit 8, *Supra*]

173.     Renee Steinaker also provided a copy of the photograph of the iPad to Southwest Airlines' managers, Edwards and Kissman. (*Id*.)

174.     Both Edwards and Kissman confirmed that the Pilot's story regarding the cameras on the flight was not just implausible, it was a lie. Southwest has never had such a program and it was implausible to believe it ever would.

175.     In her initial report to Southwest Airlines' management, Renee Steinaker specifically expressed her concern for the passengers and crew members who had utilized the lavatory on the flight.

176.     Renee Steinaker also divulged that, due to an upset stomach, she had personally used the lavatories multiple times before the incident.

177.     Due to the severe nature of the intestinal illness Renee was enduring, not only was she required to use the forward lavatory on multiple occasions, she took extra time and care to ensure that she had properly cleaned all areas where her buttocks, genitalia and thighs and legs could have become contaminated by solid or liquid fecal matter and/or the blue "toilet water" used in aircraft lavatories.

CRONUS LAW, PLLC

178.    This process of self-cleaning was accomplished by holding her dress above her waist, while her undergarments were pulled down while using the mirror over the sink to examine closely all of the areas that were potentially contaminated carefully, before dressing and returning to her duties.

179.    Renee Steinaker did this approximately 4 times before the flight took off and an additional 4 times during the first 2 to 2 ½ hours of the flight.

180.    Renee Steinaker also made sure to leave the bathroom clean and presentable for the passengers.

181.    In text conversations with her supervisor Deborah Edwards on March 3, 2017, 4 days after the incident, Renee Steinaker described her mental and emotional response to the actions of the Pilots and the idea that they repeatedly watched her undress as being unable to sleep, having dreams and nightmares.[*See*, Exhibit 13, March 13, 2017 text messages between D. Edwards and R. Steinaker.]



182.    In her text responses, Edwards acknowledges the horrible nature of the Pilots' actions, acknowledges the extreme mental distress and suffering Renee Steinaker is enduring and expresses her hope that this is the "first and only time" the pilots have put a camera on a plane:

> *"I know I am so sorry. Try and not focus on it if u can.* ***Hopefully this was the first time and he only put the camera there right as he went in. I don't know how they could ever feel like something like this was okay*** *I am so so sorry"*. (*Id.*)

183.     Edwards also promises that Southwest is taking the investigation very seriously and is taking steps to preserve the evidence stating:

> They are taking this investigation very serious and I just spoke to our HR business partner and **she's making sure it is a thorough investigation**
>
> **Our security team is going to see if they can get access to the cameras at the top of the jetway,** they are owned and operated by the city. (*Id.*)

184.     At this point, Renee Steinaker believed her supervisor's representations to be true and expressed her appreciation that Southwest was taking her report seriously and would take action against the pilots:



(*Id.*)

185.     Those representations made on March 3, 2017 were not true and Southwest's management knew they were not true.

186.     Southwest did not preserve any evidence on February 27, 2017 from the aircraft or its voice recorders, nor did it immediately seize, review, examine or preserve the iPad. Instead it let the Pilots' take the aircraft and iPad to Nashville, Kentucky and where Southwest allowed other pilots to simply conduct telephone interviews with Graham who denied actually filming Renee and offered up the now impossible to disprove "prank" video explanation. [*See*, Exhibit 14, emails from Southwest Pilots P. Paulkitus and M. Montgomert]

187.     Despite being copied on the emails in Exhibit 14, during an April 4, 2017, telephone conversation initiated by Deborah Edwards, she herself admitted that she did not believe it was a joke or prank. [*See*, Exhibit 15, Transcript of April 4, 2017 call between R. Steinaker, D. Edwards and J, Dippipa]

-25-

**Renee Steinaker;**

**I still I don't think it was a joke**, Deb there's no way he was such in sync. And then why would you? I mean, **that's not a joking issue**. I mean…

**Deb Edwards**:

**I agree.**

**Renee Steinaker:**

If I, you know, and I can't see someone doing that to, you know, someone that you even you're not having interaction with or you know, like a joke, because **when somebody has a funny line with a punch joke, and you laugh at it together,** not something that's completely, you know, I just…

**Deb Edwards:**

Right I guess, I get that, Renee, ….**Because, you know, it doesn't seem funny. I don't know how someone would think that is funny. It's very disturbing that someone would think that is funny, as you know, if it's not a joke and they, you know, we're recording live. I mean, that's a whole other issue.** But I again can promise you we do not have cameras on our aircraft. ...That is completely not true. (*Id.*)

188.    During that same March 4, 2017 phone conference, with another Southwest supervisor, John DiPippa participating, Renee Steinaker again described the emotional and mental distress that she was experiencing as a result of the incident and, again, Southwest representatives acknowledged the severity of both the actions and the mental and emotional distress Renee Steinaker was suffering, which both of them acknowledged to be valid:

**Deb Edwards:**

"….they've continued to say that throughout the whole time, which I know trust me, **I understand why that could make you upset.** And um, you know, he's saying he had it prerecorded, which I mean, I can't prove that one way or the other, but um, he's saying that he hadn't recorded and what you saw and heard, was basically synchronized. Um. **But I**

**understand you know why you're frustrated. I do get that.** Um and that's why I was hoping with the debrief that kind of might help you guys feel like you can get some closer to it, because **I don't want you to continue to have a hard time."**

(*Id.*)

189.     During that same call, after being informed that Renee Steinaker had been disciplined for missing flights because of her distress, Edwards and DiPippipa suggest that she go on Family Medical Leave to avoid additional penalties and because she was suffering severe mental and emotional health problems.

**Renee Steinaker:**

I took the hit on points in April.

------------

**Deb Edwards:**

What about um FMLA?

-----------------

**Renee Steinaker:**

I, Could I do FMLA for this?

**Deb Edwards:**

Yeah. There's no reason why you couldn't. I mean, if you were feeling anxiety over what happened? Absolutely. **Your doctor will just have to do the paperwork for you.**

(*Id.*)

190.     Edwards and DePippipa agreed to help Renee Steinaker file a Family Medical Leave Act (not Worker's Compensation) claim and confirmed her own doctor, not a Southwest selected doctor, would need to sign off on the form:

**John Dippipa:**

So Deb's filling out the paperwork as we speak, Renee, and what she's going to do is she's going to send it to your winco account.

**John Dippipa**:

And then you just got to print it out, **take it to the doctor**, right, print it out. **Just take it to the doctor.** And then you could go with A&L it'll fall back.

**Renee Steinaker:**

Okay, sounds good. I believe I was at negative five before I called in.

**Deb Edwards:**

Oh yeah, checking on points. Let me go back to that I started doing FMLA. For March 29. Lately, make sure I have the right date here. Yeah. So you're sick on March 29. **You could apply for FMLA for that trip, and if there's any that come up in the future**. (*Id.*)

191.   They then discussed her missing work for anxiety related doctors' appointments,

**Deb Edwards**

Now did you call on sick on the 10th, 11th and 12th? Because of anxiety due to the situation?

**Renee Steinaker:**

Yeah, I went and had um the colonoscopy.

**Deb Edwards:**

Because of, you were feeling so much stress and anxiety because of this?

**Renee Steinaker:**

Yeah, I went to the doctor the week I went to the doctor on the seventh and I said, I'm having a hard time and I said, I just am stressed and everything. And so I called in sick for that. And she went ahead and scheduled me for the colonoscopy then. …I had the colonoscopy done on the 13th. And, and so I had to do the prepping on the 12th…

(*Id.*)

**SOUTHWEST ROUTINELY INVOKES THE PROTECTIONS OR WC/ICA REGULATIONS AND PROTOCOLS TO EVALUATE AND COMPENSATE WORKERS INJURED ON THE JOB. IT DOES NOT DO SO FOR SEXUAL HARASSMENT CLAIMS, DISCRIMINATION CLAIMS, INTENTIONAL**

-28-

1

**SEXUAL ASSAULT CLAIMS OR RETALIATION CLAIMS.**

2

3       192.     According to the Arizona Industrial Commission, the agency which

4    regulates Arizona's workman's compensation statute, in Arizona, an employer is required

5    to do the following: When an employer is advised by a worker that an on-the-job

6    injury/illness has occurred, the employer is <u>required</u> to report the incident to the insurance

7    carrier and the Industrial Commission of Arizona within 10 days." (Emphasis added).

8    [*See*, Exhibit 16, Excerpt of Industrial Commission of Arizona, Worker's Compensation

9    Information for the Injured Worker, Revised December 8, 2015][2]

10      193.     Southwest Policies require an employee injured on the job to notify a

11   "Leader" (i.e.  supervisor or Workers Comp Claim specialist[3]), who will file a report,

12   assist in getting paperwork filled out, including a medical authorization form and

13   scheduling appointment with doctors of Southwest's choosing for evaluation, care and

14

---

[2] This is consistent with the actual language of the statute. A.R.S. Sec. 23-908. <u>Injury reports by employer and physician states:</u>

E. When an accident occurs to an employee, the employee shall forthwith report the accident and the injury resulting from the accident to the employer, and any physician employed by the injured employee shall forthwith report the accident and the injury resulting from the accident to the employer, the insurance carrier and the commission.

F. If an accident occurs to an employee, the employer may designate in writing a physician chosen by the employer, who shall be permitted by the employee, or any person in charge of the employee, to make one examination of the injured employee in order to ascertain the character and extent of the injury occasioned by the accident.  The physician so chosen shall forthwith report to the employer, the insurance carrier and the commission the character and extent of the injury as the physician ascertains…

G. Within ten days after receiving notice of an accident, the employer shall inform the insurance carrier and the commission on the forms and in the manner as prescribed by the commission.

H. Immediately on notice to the employer of an accident resulting in an injury to an employee, the employer shall provide the employee with the name and address of the employer's insurance carrier, the policy number and the expiration date.

I. Any person failing or refusing to comply with this section is guilty of a petty offense.

[3]Flight Attendants should contact the Workers Compensation Department at xxx-xxx-xxxx. **The Workers Compensation Representative will help to ensure Workers' Compensation claims are processed correctly according to the applicable state laws. While the Workers Compensation Representative cannot change the laws, they can help to ensure claims are processed correctly to prevent loss of any benefits to which Flight Attendants may be entitled. (*Id.*)**

CRONUS LAW, PLLC

treatment:

Notify a Leader immediately to report an injury or illness. Late or untimely reporting of an injury may affect a claim and benefits. A Leader will provide the injured Flight Attendant with necessary paperwork to see a doctor at a designated occupational clinic, if necessary.

An authorization to treat (a Physician's Statement From HR727) will be immediately emailed to your Southwest Airlines email address when the I3R+is completed; provide this form to the treating physician; this form will supply SWA, when submitted, with the Flight Attendant's status and diagnosis and provide an authorization for payment as a Workers' Compensation claim.

Complete an on-line irregularity report (SOP!); a Leader will complete an injury report (BR) and the Flight Attendant will need to sign the report, this applies whether or not medical attention is sought.

[*See*, Exhibit 17, SWA Policy re: Workers Compensation Injuries and Claims.]

194.     Arizona Law does not require reporting of sexual harassment claims, sexual assault claims, sexual discrimination claims or retaliation claims per the Workers Comp Statute as these are not covered claims.

195.     Arizona Law does not require permit an employer or employee who has engaged in sexual harassment claims, sexual assault claims, sexual discrimination claims or retaliation claims to invoke the protections and exclusivity provisions of the Workers Comp Statute, as these are not covered claims.

196.     Southwest and its administrators and attorneys are very familiar with the provisions of the Arizona Workers Comp statute and regulations.

197.     Southwest did not report, nor seek coverage from the ICA for the injuries caused by its Pilots because it understood that the sexual harassment endured by Plaintiff was not a covered claim.

198.     Southwest did not report, nor seek coverage from the ICA for the injuries caused by its own actions and the retaliation it has engaged in because it understood that the injuries suffered by Plaintiffs due to its retaliation are not covered claims.

199.     The history that Plaintiffs have with Southwest and covered on the job injuries supports the conclusion that all parties involved understood that the injuries Renee Steinaker sustained as a result of the defendants' intentional gender-based harassment

-30-

and/or hazing claims are not covered by the Workers Comp statute.

200.     Both David Steinaker and Renee Steinaker have sustained physical injuries on the job during their 20-plus years as Southwest employees.

201.     In each case, Southwest immediately notified them that the injuries were subject to the Arizona Worker's Compensation statute and regulations.

202.     In each case Southwest also filed reports with the Arizona Industrial Commission.

203.     In each case, Southwest exercised its rights under the statute and regulations to have doctors of its choosing examine Renee Steinaker and David Steinaker.

204.     Renee Steinaker immediately verbally reported the incident on Flight 1088 within minutes of being allowed to depart the aircraft.

205.     At no time did Southwest inform Renee Steinaker that it considered her claims and injuries to be covered by the worker's compensation statute and direct her to see a physician of its choice for evaluation and treatment.

206.     Instead, Southwest told her that she needed to seek her own medical treatment, which she did from a private doctor and, as set forth in paragraphs 182-184 above, recommended she file for Family Medical Leave to avoid accumulating "points" (i.e. demerits) and assisted her in filling out the application forms.[*See* Exhibit 15]

## THE COVER-UP

207.     Renee Steinaker and the other crew members informed Southwest Airlines' management personnel, immediately after landing, that Graham and Russell had a layover in Phoenix before they were scheduled to fly the same aircraft, (N8658A) now re-designated as Flight 1714 to Nashville, Tennessee.

208.     Renee Steinaker and the other crew members expected that Southwest Airlines would immediately interview Graham and Russell and preserve all available evidence, including seizing any iPads, cameras, and recording equipment they may have possessed, obtaining and preserving all relevant flight data, including but not limited to the cockpit voice recordings and take all other reasonable and necessary steps to properly

CRONUS LAW, PLLC

investigate the incident.

209.    Upon information and belief, Flight 1714 departed from Southwest's Sky Harbor Terminal 4 facilities approximately one hour after it (Flight 1088) landed and was staffed by a new crew of flight attendants, none of whom were informed or aware of the filming in the lavatory observed and documented by Renee Steinaker on Flight 1088 or Russell's claims that Southwest Airlines installed and was using hidden cameras to secretly observe and record passenger and crew's use of the lavatories on all Southwest Airlines' 737-800 series aircraft.

210.    Southwest has admitted and provided documentation confirming that despite receiving Renee Steinaker and her crew's reports on February 27, 2017, Southwest Airlines permitted Graham and Russell to depart the Southwest Airlines' reginal headquarters in Arizona on the aircraft where the livestreaming incident had occurred, without any Southwest Airlines' manager, supervisor, technician or security personnel having: (a) interviewed Graham or Russell regarding the allegations against them; (b) reviewed, copied or seized any iPads or communication recording/devices on the flight deck, including the iPad which Renee Steinaker photographed the image of Graham in the lavatory; (c) reviewed or preserved the flight data and flight deck voice recorders; or (d) searched the forward or aft lavatories of Flight 1088 before Graham and Russell were permitted to leave their jurisdiction, nor were any of these actions taken by Southwest Airlines upon Flight 1714's arrival in Nashville, Tennessee.

211.    Southwest has admitted and provided documentation confirming that Southwest Airlines' managers knowingly permitted Graham and Russell to keep sole control of and possession over their phones and iPads, including those which were used to observe individuals using the forward lavatory.

212.    Upon information and belief, Southwest's managers failed to preserve any evidence or testimony despite knowing that Graham and Russell would likely destroy, delete, or modify the evidence on the devices, making it impossible to determine what had actually occurred.

213.    Southwest has admitted and provided documentation confirming it did not contact or report the incident to any law enforcement agencies on the date of the incident, despite the fact that numerous law enforcement agencies have substation and personnel stationed at both Phoenix Sky Harbor International Airport and Nashville International Airport.

214.    Southwest has admitted and provided documentation confirming its management not only decided to let Graham and Russell leave the state with the potential evidence of criminal activity in their sole possession and control, it failed to secure or allow any law enforcement agency to investigate and secure any of the potential evidence available on the aircraft itself before allowing it to leave Arizona.

215.    Southwest Airlines' personnel knew or should have known that it is unlawful for any person to knowingly photograph, videotape, film, digitally record or by any other means secretly view, with or without a device, another person without that person's consent under either of the following circumstances: 1) in a restroom, bathroom, locker room, bedroom or other location where the person has a reasonable expectation of privacy and the person is urinating, defecating, dressing, undressing, nude or involved in a sexual intercourse or sexual contact; 2) in a manner that directly captures or allows the viewing of the person's genitalia, buttock or female breast, whether clothed or unclothed, that is not otherwise visible to the public.[*See* 18 U.S.C.A. § 1801 and A.R.S. § 13-3019]

216.    Renee Steinaker and the other crew members requested that management obtain the cockpit recordings from the flight to corroborate the details set forth in the incident reports, as well as the feed from Graham's iPad and the camera footage from the airplane gate for the flight.

217.    Southwest Airlines admits that it promised to conduct a thorough investigation.

218.    Southwest has admitted and provided documentation confirming that it did not do so, but quickly accepted and circulated throughout the company the pilots' claim that the video was a "prank" video of the Captain in the lavatory to make the crew think

-33-

that they had all been filmed in the lavatory while working on Southwest Airline Flights.

219. Southwest Airlines repeatedly refused to tell Renee Steinaker what disciplinary actions, if any, it had taken against the pilots, who was investigating the incident or what was being done to resolve her fears and concerns, but promised to quickly schedule a meeting to explain what happened.

220. Several months later, after multiple delays, Southwest Airlines held a "debrief" in Dallas headquarters. Although the pilots were not required to attend, Southwest Management claimed it confirmed the iPad video seen and photographed by Renee Steinaker, although real, was a "prank" intentionally perpetrated on Renee Steinaker by Graham and Russell.

221. Southwest Airlines claimed it hired a forensic expert to view the iPad recording and verify the "prank" story. However, Southwest Airlines has refused and continues to refuse to allow any independent experts not under its exclusive control to have access to the iPad or "prank" recording or to even videotape the "prank" recording playing on the iPad it claims was the iPad in use on Flight 1088.

222. Southwest Airlines and the other defendants admit that these pilots created and possessed a video showing Graham using a Southwest Airlines' lavatory on a Southwest Airlines' aircraft. The Defendants assert, however, that the video was taken prior to the departure of Flight 1088 from Pittsburgh.  Based upon Renee Steinaker's personal observations while in the cockpit on flight 1088, Defendants' "prank" assertion is implausible and a lie.

223. Southwest Airlines has provided no evidence that the iPad was used to support its and its pilots "prank" video story is the iPad that was, in fact, the one seen by Renee Steinaker Flight 1088 on February 27, 2017.

224. Southwest Airlines denies it has ever placed, sanctioned, or was aware of cameras or recording devices on Flight 1088 or any other aircraft.

225. Southwest Airlines, by and through management and supervisory personnel, admonished Renee Steinaker and other flight attendants not to discuss or disclose what

occurred on the flight, what they observed on the flight deck, or the admissions by the pilots that they and/or Southwest Airlines intentionally observed and made recordings of passengers and crew who used the lavatories during the flight without the passenger or crew's knowledge or consent. This order to refrain from telling anyone about the live streaming incident specifically included any and all persons or agencies, including family, coworkers, Plaintiffs' labor union, Southwest security personnel, and outside law enforcement.

226.    Renee Steinaker was specifically directed by a supervisor that she was not to talk to *anybody* about what happened because, "If this got out, if this went public, no one, I mean no one, would ever fly our airline again."

227.    Instead of securing evidence or investigating the actions, statements, and behavior of its pilots, Southwest Airlines, through its CEO and top management, has engaged in a continuing pattern of retaliation and monitoring efforts to silence and intimidate all four (4) flight attendants on Flight 1088.

228.    This same pattern of retaliation and harassment, including monitoring his flights, has been inflicted upon Renee Steinaker's husband, David Steinaker.

229.    Upon information and belief, all of the flight attendants on Flight 1088 have been and continue to be repeatedly stalked and monitored by Southwest Airlines' managers in a similarly threatening and bizarre manner.

230.    Renee Steinaker has repeatedly been subjected to an unusual and excessive number of "performance audits" in which a manager gate checks her and observes her in person during the entire flight.

231.    David Steinaker was subjected to at least five (5) audits in the course of a few months following the incident. He has also been subjected to contemporaneous surprise drug and alcohol testing. In his prior twenty-four (24) years of service, he only had approximately three (3) audits and had never been asked to provide multiple sample(s) for simultaneous drug and alcohol screenings.

232.    Upon information and belief, the audits described above were falsely labeled

"team building" efforts as a way to circumvent the company's requirement in the collective bargaining agreement that management document each performance audit in writing for the flight attendant's personnel file.

233.    One or more of the flight attendants on Flight 1088 were also subjected to unjustified "random" drug and alcohol testing and, upon information and belief, one flight attendant was forced to undergo multiple drug tests in a very short period of time.

234.    Upon information and belief, there have been no sanctions taken against Graham or Russell who continue to pilot aircrafts for Southwest Airlines.

235.    Upon information and belief, Graham and Russell made false representations about Renee Steinaker and the relevant events on Flight 1088, which were adopted and repeated by Southwest Airlines.

236.    Graham and Russell admit that they have not been punished and are still employed as flight officers by Southwest Airlines.

237.    Renee Steinaker has been trained that her primary responsibility as a flight attendant is to be an integral member of a professionally trained fight crew who are tasked with and entrusted with ensuring the safety and security of the thousands of men, women and children who pay Southwest Airlines to safely transport them to and from destinations in complex, sophisticated, and dangerous aircraft where the room for error is minimal and even minor mistakes can lead to potentially fatal events.

238.    The mission of the flight crew can only be safely accomplished through the crew's coordinated action, cooperation and confidence in the chain of command, adherence to FAA regulations and Southwest Airlines' safety and security policies, procedures and protocols and the trust the officers and crew have in each other.

239.    The events of February 27, 2017 and the Defendants' subsequent actions and failure to act have destroyed the trust Renee Steinaker has in her employer, her commanding officers and the officers and directors of Southwest Airlines.

240.    On or around December 22, 2017, as Southwest acknowledges Plaintiff Renee Steinaker timely filed Charge of Discrimination No. 540-2018-01152 with the

-36-

Equal Employment Opportunity Commission ("EEOC") alleging that the events that took place on Flight 1088, and the adverse actions taken against her and her husband by Southwest Airlines, constituted unlawful sex discrimination, sexual harassment, and retaliation in violation of federal law under Title VII of the Civil Rights Act and in violation of state law under the Arizona Civil Rights Act.[*See*, Exhibit 18, EEOC complaint]

241.    Plaintiff requested and received a "Notice of Right to Sue" from the EEOC on Charge of Discrimination No. 540-2018-01152, in compliance with the mandatory administrative procedures required by federal law. [*See*, Exhibit 19, EEOC Right to Sue letter]

242.    Exhibit 19 permits Plaintiffs to allege additional causes of action for sex discrimination, sexual harassment, and retaliation and confers jurisdiction over these claims upon this Court.

243.    Southwest Airlines is liable for the actions of pilots Graham and Russell pursuant to the Arizona doctrine of *respondent superior*, and for its independent actions as a joint tortfeasor that engaged in independent unlawful and intentional acts which damaged and harmed Plaintiffs, including, but not limited to its express authorization or ratification of the pilots' unlawful conduct, its failure to take reasonable remedial action, and/or its intentional and fraudulent concealment of the true events and circumstances.

### FIRST CAUSE OF ACTION

**Title VII – Sex Harassment/Discrimination**

**(Renee Steinaker Against Defendant Southwest Airlines)**

244.    Renee Steinaker incorporates by reference all of the previous allegations in this Third Amended Complaint as if fully set forth herein.

245.    At all relevant times, Renee Steinaker was an "employee" as defined in 42 U.S.C. § 2000e(f).

246.    At all relevant times, Southwest Airlines was an "employer" as defined in 42 U.S.C. § 2000e(b).

247.    Renee Steinaker was one of 3 female flight attendants assigned to Flight 1088. There was only 1 male flight attendant, Larry Jackson, and Larry Jackson was assigned to the rear service galley of the Flight.

248.    Defendants Graham and Russell knew of the configuration and assignments of the flight attendants on the Flight.

249.    As is set forth herein Graham and Russel knew that the flight crews gender composition meant that when they ordered a flight attendant to come to the cockpit, there was a 75% chance it would be a female flight attendant who responded.

250.    As is set forth herein Graham and Russel knew that the flight crews gender composition, Larry Jackson's assignment, size, gender and Southwest's culture, when they ordered a flight attendant to come to the cockpit, there was an almost 100% % chance it would be a female flight attendant who responded.

251.    Prior to being assigned to Flight 1088, Renee Steinaker had no knowledge of or relationship with either Graham or Russell.

252.    They were not friends. They did not socialize. To her knowledge they had never flown together and she is certain that they had never been assigned to a assignment that had required them to stay overnight in the same hotel or to travel to and from that hotel to the airport.

253.    As is set forth herein, due to an intestinal illness that pre-dated Flight 1088, in the time between ordered to come to the cockpit, Renee Steinaker was required to use the forward lavatory 8 times (4 on the ground and 4 in the air).

254.    While Renee Steinaker was in the cockpit with FO Russell, she was subjected to derogatory and suggestive looks and comments before and after she heard and observed Graham in the bathroom,

255.    Russell told her that there were secret cameras that were recording all activity in the lavatory.

256.    If true, this mean that Graham and Russell had surreptitiously and without permission watched her disrobe, use the facility and then carefully clean up herself before

returning to her duties.

257.    These actions were not welcomed and were degrading and humiliating to Renee Steinaker as a female in the workplace attempting to work as a crew member with her male counterparts and superiors.

258.    If untrue, Renee Steinaker was the target of prohibited Hazing and Harassment based on her gender in direct violation of SOUTHWEST policies.

259.    Renee Steinaker was subjected to unwelcome harassment on the basis of her sex and sexual nature as a result of the incident that occurred on Flight 1088.

260.    The harassment was objectively and subjectively offensive to a reasonable person.

261.    The harassment negatively affected her working relationship with her superior officers and ultimately her employer, Southwest.

262.    The offensive harassment has been acknowledged by Southwest's supervisors who received the reports of the Pilot's actions.

263.    Southwest claims it took the allegations seriously and investigated them as violations of the code of conduct involving its harassment policies.

264.    Southwest claims that it has disciplined the Pilots for their actions, but until the filing of this lawsuit and the deadline for disclosure passed, refused to disclose either the punishment or the basis for it. Graham received a Letter of Counseling that had a 2-year duration and Russel was not punished at all.

265.    Since the reporting of the incident, Southwest , its pilots and employees have engaged in a series of attacks and retaliatory measures against Renee Steinaker, including the tolerating of a "Go Fund Me" site in support of the Pilots that contains numerous sexist, degrading and humiliating comments and threats of harm against Renee Steinaker.[*See*, Exhibit 20, excerpts from Defendant Graham and Russell's Go Fund Me site.]

266.    This ongoing harassment is consistent with the culture of Southwest airlines, including tolerating such initiation rituals as acknowledged by the Pilots discovery requests, Flight Attendants are requested to come to the cockpit and strip or show their

breast to the pilots.

267. The harassment was likewise sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile or abusive.

268. Southwest Airlines knew or should have known of Graham and Russell's conduct and failure to take prompt remedial action to stop their conduct in violation of 42 U.S.C. § 2000e-2(a).

269. As a result of Defendant Southwest Airlines' conduct, Renee Steinaker has suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience and she is entitled to general, special, and economic damages, including front and back pay.

270. Plaintiff is also entitled to and seeks her attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

271. Southwest Airlines acted willfully, wantonly, and/or with malice or a conscious and/or reckless indifference to Renee Steinaker's equal rights under the law, thereby necessitating the imposition of exemplary or punitive damages.

## SECOND CAUSE OF ACTION

### Title VII Retaliation

### (Renee Steinaker Against Defendant Southwest Airlines)

272. Plaintiffs incorporate by reference all of the previous allegations in this Fourth Amended Complaint as if fully set forth herein.

273. Southwest Airlines admits that, at all relevant times, it was an employer and Renee Steinaker and David Steinaker were "employees."

274. The terms "employer" and "employee" are as defined at 42 U.S.C. § 2000e (b) and (f), respectively.

275. The actions described herein by Graham and Russell were either illegal under federal and state law or reasonably appeared to Renee Steinaker and other Southwest Airlines' employees to be illegal and improper and had a significant and

immediate negative impact on the crew's trust in its commanding officers, disrupted the crew's cohesion and distracted the crew from its primary directive of concentrating on passenger and flight safety and security, placing the aircraft, crew and passengers at risk.

276.   Renee Steinaker was obligated to report these events. Failure to do so would have been grounds for discipline or dismissal, especially if, as suspected, Graham and Russell had engaged in video voyeurism on this and other flights and it was later discovered that the crew of Flight 1088 was aware of their activities and kept silent.

277.   Renee Steinaker's reporting of these events caused Southwest Airlines to take actions which effectively changed the terms and conditions of Renee Steinaker's employment and reasons that Southwest Airlines submits for changing the terms and conditions of Plaintiff's employment are false and pretext for unlawful discrimination

278.   Renee Steinaker engaged in protected activity by reporting, complaining of, and/or opposing the illegal conduct and sex-based harassment she and her fellow flight attendants suffered on Flight 1088 by Graham and Russell.

279.   Renee Steinaker engaged in protected activity by reporting, complaining of, and/or opposing the unlawful retaliation that she, David Steinaker (her spouse), and her fellow flight attendants on Flight 1088 were subjected to following her reports of sexual harassment by Graham and Russell.

280.   Southwest Airlines unlawfully retaliated against Renee Steinaker in the terms and conditions of her employment, as a result of her protected activity by taking various adverse actions against her and her spouse, David Steinaker.

281.   These prohibited, retaliatory actions included, but were not limited to:

a.   Harassing, intimidating, and/or stalking Plaintiffs during shifts;

b.   Threatening or implying threats to Plaintiffs' employment status and/or reputation with the company;

c.   Excessively monitoring, auditing, and scrutinizing Plaintiffs' work performance without justification;

d.   Disparaging or embarrassing Plaintiffs;

-41-

e.      Engaging in abusive conduct against Plaintiffs;

f.      Isolating Plaintiffs in the workplace;

g.      Subjecting Plaintiffs to unwarranted and frivolous performance evaluations, drug and alcohol testing, and in-person work audits;

h.      Blocking grievance attempts and/or attempts to report or disclose the incident to others; and

i.      Engaging in other similar actions that would dissuade a reasonable employee from engaging in future protected activity.

282.    As a direct and proximate result of Southwest Airlines' retaliatory conduct, Renee Steinaker and David Steinaker have suffered damages, including but not limited to loss of income, emotional distress, mental anguish, humiliation, indignation and embarrassment, loss of enjoyment of life, deprivation of the right to equal employment opportunities, and other economic and pain and suffering damages.

283.    Renee Steinaker and David Steinaker are entitled to actual and compensatory damages, including front pay, back pay, pain and suffering, and all other economic and noneconomic losses.

284.    Renee Steinaker and David Steinaker are also entitled to and seek reimbursement for attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

285.    Southwest Airlines acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Renee Steinaker's equal rights under the law, thereby necessitating the imposition of exemplary or punitive damages.

**WHEREFORE**, Plaintiff Renee Steinaker request judgment in her favor and against Defendants as follows:

A.      For an award of Plaintiff's actual, consequential, and incidental damages, including backpay or front pay for any lost wages, in an amount to be determined at trial;

B.      For an award of Plaintiff's physical injuries, emotion and mental distress, pain and suffering damages caused by Defendants' wrongful acts;

C.      For special damages including exemplary and/or punitive damages in an

amount to be proven at trial;

D.     For an award of Plaintiff's attorney's fees and costs incurred in this matter under any applicable law, contract provision, statute, rule, or regulation;

E.     For an award of pre- and post-judgment interest on each element of damage, cost, or attorney's fees at the highest legal rate from the date incurred until paid; and

F.     For such other and further relief as this Court deems just and proper.

**WHEREFORE**, Plaintiff David Steinaker requests a judgment in his favor on Counts 4 and 5 only and against Defendants as follows:

G.     For an award of Plaintiff's actual, consequential, and incidental damages, including backpay or front pay for any lost wages, in an amount to be determined at trial;

H.     For an award of Plaintiff's physical injuries, emotion and mental distress, pain and suffering damages caused by Defendants' wrongful acts;

I.     For special damages including exemplary and/or punitive damages in an amount to be proven at trial;

J.     For an award of Plaintiff's attorney's fees and costs incurred in this matter under any applicable law, contract provision, statute, rule, or regulation;

K.     For an award of pre- and post-judgment interest on each element of damage, cost, or attorney's fees at the highest legal rate from the date incurred until paid; and

For such other and further relief as this Court deems just and proper

RESPECTFULLY submitted this 30th day of July, 2020.

**CRONUS LAW, PLLC**

By:/s/Jeff Bouma
    Jeff Bouma
    Larry Cohen
    Joel Fugate
    2601 E Thomas Rd., Ste. 235
    Phoenix, AZ 85016

-43-

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on July 30, 2020 my office electronically transmitted the foregoing to the clerk's office of the Arizona District Court for filing. A Notice of Electronic Filing should be sent to the assigned judge, the Honorable Steven P. Logan, and the following counsel of record:

Ronald L.M Goldman
Diane Marger Moore
**BAUM HEDLUND ARISTEI GOLDMAN**
10940 Wilshire Blvd. 17th Floor
Los Angeles, California 90024
rgoldman@baumhedlundlaw.com
dmargermoore@baumhedlundlaw.com
*Attorneys for Plaintiffs*

R. Shawn Oller
Peter Prynkiewicz
**LITTLER MENDELSON, P.C.**
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016
soller@littler.com
pprynkiewicz@littler.com
*Attorneys for Defendant Southwest Airlines, Co.*

Dominique Barrett
Lori Metcalf
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
2390 E. Camelback Rd., Ste. 440
Phoenix, AZ 85016
dominique.barrett@qpwblaw.com
lori.metcalf@qpwblaw.com
*Attorneys for Defendants Terry Graham and Ryan Russell*

By:/s/Patti Hibbeler