CRONUS LAW, PLLC
Larry Cohen, AZ Bar No. 010192
Joel Fugate, AZ Bar No. 031739
Ivan Hannel, AZ Bar No. 029318
2601 E. Thomas Rd., Ste. 235 Phoenix, AZ 85016
Phone 480-467-3188
ljc@ljcohen.com; ivan@cronuslaw.com;
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Renee Steinaker;

Plaintiffs,

vs.

Southwest Airlines, Co., a Texas Corporation; Terry Graham and Jane Doe Graham; Ryan Russell and Jane Doe Russell;

Defendants.

Case No.: 2:19-cv-05022-SPL

**PLAINTIFF RENEE STEINAKER'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT SOUTHWEST AIRLINES, CO.**

*(Assigned to the Honorable Steven P. Logan)*

Based Plaintiff Renee Steinaker ("Renee") should be awarded summary judgment against Defendant Southwest Airlines, Co. ("SW") on Count 1, Sex Harassment/Discrimination and Count 4, Intentional Infliction of Emotional Distress, because the harassment occurred regardless of whether (1) a hidden lavatory camera actually recorded Renee, as alleged in the Fifth Amended Complaint, [Dkt. 109], or (2) Renee was pranked into thinking she was being recorded in the lavatory, the way SW justifies what was done to her. In either case, Renee suffered serious harm, and SW recklessly tried to cover up its misconduct. No genuine issues of material fact prevent resolving these claims pursuant to Fed. R. Civ. P. 56.

**MEMORANDUM OF POINTS AND AUTHORITIES**

SW has violated federal and state law and disregarded its own policies and procedures. First, SW subjected Renee to harassment based on her sex when its pilots recorded her and

CRONUS LAW, PLLC

others or, alternatively, intentionally made Renee believe they recorded her during SW Flight 1088 using a hidden camera placed in the lavatory. Despite knowing the severity of Renee's allegations about what happened on Flight 1088, SW failed to investigate Renee's complaint promptly or effectively; rather, SW picked a side, their pilots' side. Disregarding its own sexual harassment and incident reporting policies, SW actively tried to quash its investigation across several internal departments joined in attacks by others against Renee for having the temerity of revealing its chauvinistic corporate culture. Second, SW allowed the harassment to continue after the incident by giving its pilots a trivial punishment and failing to investigate the pilots' GoFundMe page, containing over 50 hostile comments toward Renee by SW pilots and employees. Because of SW's discriminatory conduct and reckless disregard of its responsibility to investigate and deter sexual harassment, Renee suffered discrimination based on sex that changed the terms and conditions of her employment and caused her severe emotional distress. This all comes in the wake of Renee enduring nearly two decades of sexual harassment condoned by SW's unwavering support of its predatory pilots.

## 1. FACTUAL BACKGROUND

Plaintiff Renee Steinaker ("Renee") began working as a SW flight attendant in 1998 at the age of 22. From the beginning, like the other 85% of SW's flight attendants who are female, Renee was subjected to a work environment rife with incidents of sexual harassment by its male pilots. Renee quickly came to understand that reporting them would not help or protect her because of a corporate culture that protected pilots above all else. She quickly became trapped as the longer she worked at SW, the more she had to endure the frequent indignities because she could not afford to start over elsewhere. [PSOF ¶1].

On February 27, 2017, about mid-point into Flight 1088 from Pittsburgh to Phoenix, Renee was called into the cockpit by Defendant Captain Terry Graham ("Graham") for what she understood would be a routine break to allow the pilots to use the forward lavatory. [PSOF ¶2]. Renee's experience was that it was always a female flight attendant called to the cockpit because SW's male pilots would call male flight attendants "unattractive" and insinuate they



CRONUS LAW, PLLC

CRONUS LAW, PLLC

were gay, something that Renee's husband, David Steinaker, also a SW flight attendant, had experienced first-hand throughout his career. [PSOF ¶3].

Per routine, Renee presented herself to the cockpit door. Graham saw her through the peephole, opened the door, and went past her. [PSOF ¶4]. Renee went inside and positioned herself behind Graham's empty seat. Renee then noticed a video playing on Graham's iPad. SW issued iPads to all pilots, but the iPads were supposed to be restricted to business use, such as showing flight maps and schedules. [PSOF ¶5]. The video caught Renee's attention because it showed Graham entering the lavatory, closing the door, urinating, flushing the toilet, grooming himself, and then leaving the lavatory, closing the door behind him. Renee could hear sounds from the forward lavatory that matched what she was seeing on the video. Shocked, Renee believed that she was seeing a live streaming video from a camera placed inside the forward lavatory of Flight 1088. [PSOF ¶6]. It turned out that this was exactly what the pilots wanted her to believe.

Graham testified he told Defendant First Officer Ryan Russell ("Russell") to "sell" the video by stating it was security to prevent the assembly of guns in lavatories on 737-800s. Incredulous, Renee asked Russell about what she was seeing. Russell told Renee she was seeing new security on the "down-low" in all the lavs. [PSOF ¶7]. Renee told Russell that this simply could not be legal. Russell doubled down and told Renee she had seen something she was not supposed to know about, and cameras were also in other parts of the plane. [PSOF ¶8]. It being certainly illegal that SW would have cameras in the lavatories, Renee could not ignore what she had just seen on Graham's SW-issued iPad. She also considered the possibility that Graham and Russell had hidden their own camera in the lavatory, and Russell was trying to create a cover-story to placate her. Whatever the case, Renee could not dismiss the video. It was disturbing at multiple levels. [PSOF ¶9].

Renee's first thought when she saw the video was that she, her fellow flight attendants, and passengers had been recorded while using the lavatory. Renee took out her cell phone and, in front of Russell, snapped a photo of the video playing on the iPad so she would have proof

CRONUS LAW, PLLC

of what was happening. Renee told Russell that she was going to report them to management. [PSOF ¶10]. Graham re-entered the cockpit, and Russell left the cockpit to use the lavatory. Aggravated, Renee then confronted Graham, but he pointedly refused to answer her questions. Graham appeared to try to block Renee's view of the iPad, too. [PSOF ¶11]. When Russell returned, Renee left the cockpit. Graham and Russell never told Renee it was "just a prank." [PSOF ¶12]. They left her believing that what she saw was a live stream of inside the lavatory.

Confused and panicked, Renee reported the incident to the other three flight attendants, who helped her search the lavatories and then closed the forward lavatory from passenger use. [PSOF ¶13]. After the flight landed, they joined Renee in reporting the incident to Deborah Edwards and Dave Kissman, their managers in the Inflight Department which governs the flight attendants. Despite their report of the crime she had seen committed, the plane and the pilots were allowed to leave Phoenix. Ms. Edwards warned the flight attendants not to tell anyone about the incident, even their spouses. [PSOF ¶14]. Then, instead of a prompt and effective investigation, through several internal departments, SW blatantly covered things up out of fear of negative publicity and a desire to protect its pilots. [PSOF ¶15]. SW only issued written warnings to the pilots when, for the same conduct, "behavior which reflects adversely on Southwest Airlines," a flight attendant <u>must</u> be suspended for a minimum of 30 days. [PSOF ¶16]. SW then allowed the harassment to continue by taking no action to protect Renee from slanderous attacks against her on a GoFundMe page established to help the pilots. SW defends its inaction and trivialization of what Renee endured by saying Renee should have known it was "just a prank." [PSOF ¶17]. Renee suffered severe emotional distress from SW's own risible and reckless acts, above and the harm the pilots themselves caused.

**2. ARGUMENT**

A court shall grant summary judgment if the moving party shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While all reasonable inferences must be drawn in favor of the nonmoving party, *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, (1986) those inferences are

limited "to those upon which a reasonable jury might return a verdict" in the nonmovant's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986).

**A. Renee experienced a hostile work environment on Flight 1088 and throughout her career at Southwest.**

A Title VII hostile work environment claim requires a plaintiff to prove that she was (1) "subjected to verbal and physical harassment of a sexual nature;" (2) the "conduct was unwelcomed;" and (3) "it was "sufficiently severe to alter the conditions of employment and create an abusive work environment." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (*quoting Ellison v. Brady*, 924 F.2d 872, 875-76 (9th Cir. 1991)).

*1. Renee was physically and verbally harassed before and during Flight 1088 because of her sex.*

Any reasonable jury will conclude that Renee experienced harassment of a sexual nature throughout her career at SW and on Flight 1088. Renee has testified that she has repeatedly been the victim of verbal and physical sexual harassment by SW's male pilots. Pilots have propositioned, touched, groped, shown her pornography, shown her naked images of girlfriends and wives, asked for "titty juice," and told her they were "hard" for her while in the cockpit. Renee testified that she never reported these humiliations because of her certainty that her complaints would be ignored by a company that protected its male pilot core and because of fear that she would be punished by the company for challenging its culture, and shunned and abused by co-workers, and especially by male pilots. [PSOF ¶1].

Graham's staging of the hidden camera video in a lavatory was not mere happenstance. He wanted to provoke embarrassment and indignation in Renee by making her believe she and others had been recorded therein. In *Ellison*, the Supreme Court noted that in evaluating whether conduct was because of sex, courts should understand that "Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive." In *Fuller v. Idaho Depart of Corr*., 865 F.3d 1154, 1167-68 (9th Cir. 2017), the court cautioned that "[w]e must view the evidence in light of the different perspectives of men and women." This was



CRONUS LAW, PLLC

not a common prank that just so happened to take place in a lavatory—it was a planned and staged video recording.

A real or prank video pretending to see people undress in a lavatory and record them is intrinsically based on sex. The lavatory is a place where sex is prominent because it requires revealing sex organs, and there is high expectation of privacy. The video takes place within the confines of a 737-800 lavatory. It was intended to show what appears to be a live feed of Graham using the lavatory. Graham turns to the toilet to urinate and flushes it. Graham does not appear to know he is being recorded. The video looks very real. Even Mark Montgomery, the manager who in theory investigated Graham and Russell, testified that he "could also see where someone could maybe take it the wrong way." [PSOF ¶18]. When Graham was asked what was funny about it, he testified, "It's more of the seeing that where you're not supposed to be…" [PSOF ¶19]. Russell, too, testified the video looked realistic. [PSOF ¶20].

Graham and Russell targeted Renee because she was female. When pilots want to take a lavatory break, SW's procedures require a flight attendant to enter the cockpit and join the remaining pilot until the other pilot returns. Most SW flight attendants are female. [PSOF ¶21]. Renee has testified that SW's male pilots often explicitly told her they wanted only female flight attendants to enter the cockpit. [PSOF ¶3]. On Flight 1088, after calling for a flight attendant to come to the cockpit, Graham and Russell could be confident that their victim would be female before Graham even looked to see who was to come in.[1]

Renee is not required to prove that the pilots' primary motivation was sexual in the sense of it being based on sexual desire. A plaintiff is only required to show that her sex was at least one factor in the underlying conduct; the conduct itself need not be explicitly sexual. *EEOC v. Nat'l Educ. Ass'n*, 442 F.3d 840, 845 (9th Cir. 2005) (Title VII is implicated when abuse in the workplace is directed at women "whether or not motivated by lust or a desire to drive women out of the organization"). Instead, "the ultimate question under *Oncale* is whether

[1] Since there is a dispute of fact about whether the video was a live feed or pre-recorded, Plaintiff will stipulate solely for purposes of this motion, to avoid a dispute of fact, that the video was pre-recorded, but presented to Renee to get her to believe it was a live feed, hence the "prank."



CRONUS LAW, PLLC

[the harasser's] behavior affected women more adversely than it affected men." *Id.; see Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 118 S.Ct 998 (1998). To prove harassment based on sex, the courts have further elaborated that the victim need not prove that all members of her gender were harassed, only her. *Frappied v. Affinity Gaming Black Hawk LLC*, 966 F.3d 1038 (10th Cir. 2020).

When Renee challenged the propriety of what she was seeing to Russell and Graham, because it would reveal sex, Russell replied that SW had hidden cameras in all lavatories of its 737-800s and justified the practice as part of a secret security initiative. [PSOF ¶8]. Graham pointedly ignored Renee's protests that cameras in the lavatories would enable pilots to see them and passengers unclothed, and that SW's new uniform required her to disrobe entirely before sitting on the toilet. [PSOF ¶11].

Even if the pilots had recorded a male flight attendant instead of Renee—which itself would also be discrimination based on sex—a jury would readily conclude that the pilots' behavior impacted Renee in particular because of her sex. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) ("even if [the harasser] used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby cure his conduct toward women") (interior quotes removed). As the Supreme Court said in *Bostock v. Clayton County*, "an employer cannot escape liability by demonstrating that it treats males and females comparably as groups" in its discrimination based on sex. *Bostock v. Clayton County*, 140 S.Ct. 1741, 1744, 207 L.Ed.2d 218 (2020).

2. *Renee strongly objected to the pilots' unwelcome, hidden camera scheme.*

The only evidence the jury will hear is that Renee did not welcome the pilots' harassment. Renee had never flown with these two pilots before. Graham and Russell admitted they had never met Renee prior to Flight 1088. [PSOF ¶22]. There was no personal familiarity from which a hidden-camera-in-a-lavatory video played midflight might be taken less seriously. Renee was so upset by what she saw that she took a photo of the iPad while Russell was watching her and warned him that she was reporting the video to management. [PSOF



CRONUS LAW, PLLC

¶10]. Renee also realized that she had used the lavatory eight times that flight due to stomach upset and understood the implication: The pilots, her superiors on that plane, had seen her fully undressed and repeatedly defecating. Renee had also seen a young mom and toddler use the same forward lavatory and the thought of the pilots seeing them naked sickened her. [PSOF ¶13]. When Renee landed, incensed, she immediately reported the video as promised. The pilots *never* told Renee or any of the other three flight attendants during the flight that it was a prank. They wanted her to have the very sickened reaction she did have, and that they saw her have. They never tried to diminish her distress. A jury could only conclude the pilots' actions were intended and unwelcomed harassment.

*3. The harassment Renee experienced was severe enough to objectively change the terms of her employment.*

Reasonable jurors will conclude that Renee's experiences during and after the incident were sufficiently severe to change the terms and conditions of her employment. Under Title VII, the harassing conduct must be subjectively and objectively severe under the totality of the circumstances but, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris v. Forklift Systems*, Inc., 510 US 17, 22, 114 S.Ct. 367 (1993). In evaluating whether the conduct was objectively severe, the courts must "adopt the perspective of a reasonable woman primarily because we believe that a sex-blind reasonable person standard tends to be male-biased and tends to systematically ignore the experiences of women." *Ellison at* 879. The court further noted that "conduct that many men consider unobjectionable may offend many women." *Id* at 878.

The harassment need not result in actual physical or even psychological harm to be actionable. Harassing conduct alters the conditions of employment because it "more difficult for her to do her job, to take pride in her work, or maintain a desire to stay in her position." *Steiner v. Steamboat Operating Co*., 25 F.3d 1459, 1463 (9th Cir. 1994). Even a single incident of harassment "can support a claim of hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis." *Id* at 967 (internal quotation marks omitted). See also *Clark County Sch District v Breeden*, 532 U.S. 268, 121 S.Ct. 1508 (2001).



CRONUS LAW, PLLC

The harassing conduct "is actionable if it is either sufficiently severe *or* pervasive." *Little v. Windermere Relocation*, Inc. 301 F.3d 958, 967 (2001) (emphasis in original) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399 (1986)) (internal quotations omitted).

Sexual harassment also need not involve physical or sexual touching to be actionable under Title VII. *Christian v. Umpqua Bank*, 984 F.3d 801 (9th Cir. 2020) (offensive comments that a victim heard about through other employees rather than being directly targeted can create a hostile work environment). Conduct that might otherwise be "an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender." *Id*. at 810 (quoting *Draper v. Coeur Rochester, Inc*., 147 F.3d 1104, 1109 (9th Cir. 1998)). The jury will hear about the decades of sexual harassment Renee and other flight attendants suffered and continue to suffer.

On Flight 1088, Renee was harassed by pilots who held power over her. They were the ultimate authorities on the plane, as Graham himself testified. [PSOF ¶23]. Renee trusted the pilots to do their jobs, at least. As bad as the work environment could be, Renee could not imagine why the pilots would sink so low as to place hidden cameras or make her believe they placed cameras recording her and others naked in the plane's lavatories. The incident on Flight 1088 caused Renee to panic and feel extreme stress. She worried that other passengers, including a mother, toddler and World War II veteran, had been filmed in various states of vulnerable undress because she saw them enter the forward lavatory. Renee felt humiliated by the possibility she was seen naked and defecating. After what she saw in the cockpit, Renee and the other flight attendants actively prevented passengers from using the forward lavatory to protect them from possible harm. [PSOF ¶13].

What happened after the flight was even more disturbing. Following SW's rules and accompanied by her three fellow flight attendants, Renee reported the incident to Deborah Edwards, a manager in the Inflight Department that oversees the flight attendants. They were all fearful that reporting the pilots would be held against them by SW. [PSOF ¶14]. Ms.



CRONUS LAW, PLLC

Edwards told them they could not speak to anyone about the incident, including their families. Renee was afraid of how SW would respond if she tried to report it to the police, which the flight attendants had discussed. Larry Jackson, the sole male flight attendant on Flight 1088, testified that despite considering it, he did not call the police upon landing because, "I didn't want to lose my job…But I had fears, of course, if, you know, I called the police and management didn't like that. I mean, I don't want to lose my job. I mean, 20 years—I can't afford that." [PSOF ¶24]. Sandy Pietz, another flight attendant on Flight 1088 testified that she ended up telling her husband "[b]ecause I needed to talk to someone about it. But, same answer, we didn't—we were told this can't get out, so I didn't talk to anyone." [PSOF ¶25]. When asked why she never sought medical attention, counseling or discuss the incident with anyone else, Sandy Pietz testified, "No, I was scared I would lose my job." [PSOF ¶26]. In sum, Renee believed that a crime had been committed, lost sleep, wondered if a real investigation was being done, became depressed, worked on in fear of losing her job, felt estranged from her role, and experienced censure and shunning by other SW employees for having reported what had happened. Renee endured a hostile work environment.

*4. Southwest failed to investigate the incident promptly and effectively, thus eviscerating any deterrent effect.*

Reasonable jurors will conclude that SW's investigation was not a meaningful investigation at all and compounded the harassment. An employer is subject to vicarious liability for a hostile work environment if the harassment is perpetrated by a supervisor with immediate or successively higher authority over the employee. *Burlington Industries v. Ellerth*, 118 S.Ct 2257, 524 U.S. 742 (1998). To avoid vicarious liability, the employer must prove that it exercised reasonable care and the employee failed to exercise reasonable care to prevent or end the harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998). The employer's defense depends upon the adequacy of its efforts to correct the immediate harassment <u>and</u> deter other potential harassers from similar unlawful conduct. *Ellison* at 882.

An employer's efforts to correct and deter must go "beyond [the] short term results" of stopping the immediate harassment; it must also account for "the remedy's ability to persuade



CRONUS LAW, PLLC

potential harassers from unlawful conduct." *Fuller* at 1528. A poorly done investigation is not sufficient: "An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have remedied what happened. Denial does not constitute a remedy." *Id* at 1529. In *Steiner*, the court found that an employer's investigation of the victim's claims against a harasser who repeatedly cursed at her using gender-based epithets was inadequate because it "did not seriously investigate them or strongly reprimand [the harasser]." *Id* at 1464.

SW's purported investigation spanned several departments: (i) Employee Relations, which oversaw Title VII investigations; (ii) Inflight Operations, which managed the flight attendants; (iii) Flight Operations, which managed the pilots; (iv) Labor Relations, which worked with the pilot union and the Legal department; and (v) Corporate Security, which was responsible for protecting employees. Reasonable jurors will agree that SW's investigation was so deficient it really cannot even be called an investigation.

<u>Toni Hamilton—Employee Relations:</u> Toni Hamilton was the primary investigator in Employee Relations, which oversaw investigating Title VII violations. She testified she did not recall ever seeing the 90-second video of Graham at the heart of the incident. [PSOF ¶27]. When asked why she decided not even to begin a Title VII investigation, she testified, "There was simply information that a captain had used the lav, that there was a picture. I don't know. I believe the picture was the back of his head, if I remember correctly. And that was that." [PSOF ¶28]. Renee did not report merely a photo of the back of Graham's head, she reported a video showing what appeared to be a live stream of Graham using the lavatory that implied to Renee that she, other crew, and passengers had been recorded. Ms. Hamilton did not interview the pilots or the flight attendants. [PSOF ¶29] . She wrote no report. She never spoke to Deborah Edwards of Inflight Operations, who was the first manager to meet with Renee and the other flight attendants when Flight 1088 landed, even after Ms. Edwards sent her a high-priority email about the incident. [PSOF ¶30]. When asked why, after she summarily concluded there had been no Title VII violation, she emailed Flight Operations that, "There is a real concern that this could make its way outside the company," Ms. Hamilton replied, "Just



CRONUS LAW, PLLC

because. Just what I said. I—I can't say why. It just seems like the businesslike thing to do." [PSOF ¶31]. She also did not know whether the plane had been searched for a hidden camera—it hadn't. [PSOF ¶32]. Ms. Hamilton's acts are the exact opposite of what it means to conduct an "investigation,." A textbook case of omission.

Deborah Edwards & Dave Kissman—Inflight Operations: Deborah Edwards was the first manager Renee reported the incident to after leaving the plane. She was a manager in Inflight Operations, which governs the flight attendants. She expressed regret during her deposition that she had failed to call the Phoenix police, "maybe we should have done that. Unfortunately, we didn't." [PSOF ¶33]. She testified it bothered her that the pilots weren't pulled from duty in Nashville "[b]ecause their chief pilot said that they would take care of it and that they would be pulled from their trip and follow procedures." [PSOF ¶34]. The plane was never searched, and the pilots were never removed from duty. Graham's iPad could have been secured but wasn't. When asked what procedures should have been followed, she testified, "It should have been an investigation." [PSOF ¶35]. Ms. Edwards emailed her superiors that the flight attendants were worried there would not be any investigation, "They are not convinced this is an isolated incident and they are concerned that the chief pilot in Dallas [Mark Montgomery] will try and sweep this under the rug." [PSOF ¶35]. She promised them that Corporate Security was involved to "alleviate their fears." When Ms. Edwards was asked whether she ever called Corporate Security, she testified, "I don't think so." [PSOF ¶36]. As a practical matter, Ms. Edwards did nothing. Another textbook case of omission.

Dave Kissman was Deborah Edward's supervisor in Inflight Operations. He also was present during Renee's initial meeting with Ms. Edwards. He admitted he had not been given any training for how to handle security incidents. [PSOF ¶37]. He said he never initially contacted Corporate Security, leaving it instead to Flight Operations to investigate, "[b]ecause once we passed it to Flight Operations, perhaps they would do that, and they did that. I don't know." [PSOF ¶38]. He testified he agreed the police should have been called in Phoenix. [PSOF ¶39] He testified that lavatory pranks were not part of SW's fun-loving culture. [PSOF ¶40]. He agreed that at the time, there was a real concern the incident would make its way



CRONUS LAW, PLLC

outside the company. [PSOF ¶41]. He testified that at the time, he was concerned that the punishment meted to the pilots was unlikely to be strong enough based on emails he had read from Flight Operations reprising it was all a prank. [PSOF ¶42]. He denied having called Corporate Security to tell them that Renee had called them "in error" as reported by Joe McDaniel in Corporate Security. [PSOF ¶43]. He testified he would not investigate the pilots' GoFundMe page even after Renee sent copies of the derisive comments to Mike Sims, his superior, and Sonya Lacore (Legal) asking them for help. [PSOF ¶44]. Another textbook case of omission.

Joe McDaniel—Corporate Security: Joe McDaniel worked in Corporate Security and received a call from Renee one week after the incident. Renee worried that despite Ms. Edward's assurance that security would be involved, she had not yet been contacted, so she tried calling him. Mr. McDaniel testified that he never investigated the incident because he got a voice mail from Dave Kissman that said, "he advised me that [Renee] Steinaker called me in error." [PSOF ¶45]. When asked if it was fair to say he decided to stand down because of Mr. Kissman's message, he replied, "Yes, sir." [PSOF ¶46]. He recorded this on a one-page file memorandum. [PSOF ¶¶45-46]. Another textbook case of omission.

Mark Montgomery & Keith Griffith—Flight Operations: Mark Montgomery was the primary investigator from Flight Operations, which governs the pilots. He reported to Keith Griffith. He testified he did not receive any formal training in investigations. [PSOF ¶47]. He testified he did not ask Graham or Russell about how they carried out the prank. [PSOF ¶48]. He testified that Graham told him that he copied the video from his SW iPad to his phone so that he would know what sounds to make while Renee was watching the video. [PSOF ¶49]. He testified that he only saw the lavatory video once during his investigation. [PSOF ¶50]. He testified that the video looked like it was a live stream taking place inside a lavatory. [PSOF ¶51]. He agreed the viewers "could maybe take it the wrong way." [PSOF ¶52]. He agreed that the flight attendants' action of closing the forward lavatory was evidence that they believed what Renee had seen was a live stream. [PSOF ¶53]. He testified that he never interviewed the flight attendants. [PSOF ¶54]. He testified he never spoke with or received any emails from



CRONUS LAW, PLLC

Toni Hamilton or anyone in Employee Relations. [PSOF ¶55]. He testified his investigation was based primarily on what Graham told him. [PSOF ¶56). He testified that SW never searched the plane and could have done so. [PSOF ¶57]. He testified that Graham told him he had played the prank before on others. [PSOF ¶58]. He testified that Russell told Renee they had installed cameras in the lavatories. [PSOF ¶59]. He testified that Graham admitted neither pilot revealed it was a prank to Renee. [PSOF ¶60]. He never asked Graham for the iPad or a copy of the video. [PSOF ¶61]. For Graham, he initially recommended a Letter of Counseling, a minor rebuke, which was edited by Monty Sparks in Labor Relations. [PSOF ¶62]. He testified that he had heard from Mrs. Edwards that the flight attendants might get lawyers. [PSOF ¶63]. Despite knowing that, he testified he had taken handwritten notes during the only meeting he had with the pilots and then destroyed those notes, "That—that was just something we did with every situation like this we had." [PSOF ¶64). He wrote that the flight attendants were "milking this one" because they asked for paid time off after the incident and justified, "I just don't like to see people take advantage of the company." [PSOF ¶65]. He agreed that the incident reflected adversely upon SW. [PSOF ¶66]. He agreed that the pilots' actions violated SW's sexual harassment policy. [PSOF ¶67]. Another textbook case of omission, or worse of burying a problem rather than investigating and dealing with it.

Keith Griffith was the head of Flight Operations and decided Graham's and Russell's punishments based on Mark Montgomery's minimal investigation. He testified that Renee should have known the video was a joke because it looked like a skit from "the Carol Burnett show," and he would have known it was a prank. [PSOF ¶68]. He admitted he only saw the actual video about two years after the fact. [PSOF ¶69]. He testified that Mike Sims from Inflight Operations told him their department, which supervises the flight attendants saw it as a prank and told him to "handle it however you need to." [PSOF ¶70]. Mr. Griffith admitted that the punishments he could give the pilots were governed by a collective bargaining agreement with the pilot union but could not identify any policy document speaking to pilot discipline by SW. [PSOF ¶71]. Perhaps Mr. Griffith was the worst offender because he chose to blame the victim rather than consider that anything wrong had happened.



CRONUS LAW, PLLC

*5. Southwest failed to punish the pilots because it maintains vastly different standards of punishment for its pilots, who are mostly male compared to its flight attendants, who are mostly female.*

A reasonable jury will find that SW's double-standard for punishing pilots is based on sex with no meaningful punishment for Graham and Russell. Failing to adequately punish the harasser undermines an employer's claim that it responded to the harassment effectively. *Brooks v. City of San Mateo*, 229 F.3d 917, 921-22 (9th Cir. 2000) (employer did react properly by putting the coworker on administrative leave the next day, began an investigation, and later initiated termination proceedings that led to the coworker's resignation).

Here, SW has one policy for investigating and punishing pilots and another for punishing flight attendants. For flight attendants like Renee, a first violation involving an offense of moral turpitude "or behavior which reflects adversely on Southwest Airlines" requires a minimum 30-day suspension and may result in termination. [PSOF ¶16]. By comparison, the pilots received no financial sanction and no suspension; Graham merely received a Letter of Reprimand and Russell received a Memo of Record, the lowest form of censure. This is incredible given Mr. Montgomery's agreement that what happened here was sexual harassment.

*6. Southwest failed to stop the harassment by failing to investigate the pilots' GoFundMe webpage that included comments directed against Renee.*

A reasonable jury will find that SW contributed to the hostile work environment by not investigating post-incident harassment involving the pilots' GoFundMe page. That page was titled, "Help us defend Terry Graham and Ryan Russell." Graham received over $44,000 from 569 donors and the webpage contained over 50 comments attacking Renee. [PSOF ¶74]. In *Christian v. Umpqua Bank*, the court found an employer liable for allowing its employee to be verbally harassed by a customer saying, "Where, as here, a plaintiff becomes aware of harassing conduct directed at other persons, outside her presence, that conduct may form part of a hostile environment claim and must be considered." *Christian v. Umpqua Bank*, 984 F.3d 801, 811 (9th Cir. 2020).



CRONUS LAW, PLLC

Graham's excuse for not removing the comments or asking the commentors to delete their comments was, "I wouldn't know how to do that." [PSOF ¶72]. Somehow, Graham managed to receive all the funds without ever seeing the comments. Graham's assertion is beyond credulity. The comments begin on the GoFundMe's landing page where you can see the total dollar amount of donations. The comments are literally right there. In deposition, when asked to read the comments, Graham identified several of comments as from pilots and flight attendants he knew. They called Renee "complete trash" for filing a "frivolous lawsuit" that was a "money grab" and "the Steinakers just wasted some of your drinks at the bar." [PSOF ¶72].

On July 10, 2020, Renee complained to her supervisors about the GoFundMe pages by sending an email with attachments to several SW managers including Mike Sims, manager Deborah Edwards, and Dave Kissman. [PSOF ¶17]. On October 28, 2021, when asked what he did to follow-up on Renee's complaint about the comments on the pilots' GoFundMe, Mike Sims testified, "I don't recall." [PSOF ¶73].

**B. Southwest's outrageous failure to promptly and effectively investigate the sexual harassment was reckless and disregarded the near certainty that Renee would and did suffer extreme emotional distress.**

A plaintiff alleging intentional infliction of emotional distress must prove that the defendant's conduct (1) was extreme and outrageous; (2) intended to cause emotional distress or reckless disregard of the near certainty that such distress would result; and (3) the plaintiff suffered severe emotional distress. *Craig v. M O Agencies, Inc.*, 496 F.3d 1047 (9th Cir. 2007); *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd of Governors*, 184 Ariz. 419, 909 P.2d 486, 495 (App. 1995). A "corporation could be liable for intentional infliction of emotion distress because its superior was aware of the sexual harassment of an employee by a manager and failed to stop it even though the underlying harassment might not rise to the level of either assault and battery or intentional infliction of emotional distress." *Ford v. Revlon, Inc.*, 153 Ariz. 38, 734 P.2d 580, 584 (Ariz. 1987) (*citing Davis v. United States Steel Corp.*, 779 F.2d 209, 211 (4th Cir. 1985). Though an employer is rarely liable when one employee sexually



CRONUS LAW, PLLC

harasses another, the employer may be found liable "when a company utterly fails to investigate or remedy the situation." *Craig* at 1059. An employer that has a sexual harassment policy "may not treat the policy as illusory" and disregard it. *Ford* at 583 (*citing Leikyold v. Valley View Community Hosp.*, 141 Ariz. 544, 548, 688 P.2d 170, 174, (1984)).

While the bar is high for finding an employer liable for intentional infliction of emotional distress, it is not insurmountable, and here a jury must find SW liable for two reasons. First, SW's failure to investigate and punish the pilots was outrageous and recklessly disregarded the effect it would have on Renee, causing her severe emotional distress. By failing to stop the pilots from leaving Phoenix, failing to call the police, failing to search the plane, failing to secure the cockpit flight recording, failing to secure the iPad from Graham, destroying notes from the chief investigator's only meeting with the pilots, and having an upper-level manager in Renee's own Inflight department call SW's security department to tell them Renee had called them "in error," SW did exactly what Renee feared all along—cover up for the pilots and blame her. Second, SW failed to stop ongoing harassment as found and maintained on Graham's and Russell's GoFundMe page, even after receiving Renee's letter apprising SW of the atrocious comments made about her on the page by other SW pilots and employees. All these acts caused her extreme emotional distress above and apart from what Graham and Russell did on Flight 1088.

**3. CONCLUSION**

The law demands accountability and action in cases like what is presented here. Plaintiff's motion should be granted.

RESPECTFULLY submitted this 25th day of February, 2022.

**CRONUS LAW, PLLC**

By: */s/Ivan Hannel*
Larry Cohen
Ivan Hannel
*Attorneys for Plaintiffs*



CRONUS LAW, PLLC

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of February, I transmitted the attached document to the Clerk's Office using CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants; and a copy of the foregoing by email to all counsel of record at the following addresses:

R. Shawn Oller
Peter Prynkiewicz
**LITTLER MENDELSON, P.C.**
Camelback Esplanade
2425 E Camelback Rd., Ste. 900
Phoenix, AZ 85016
soller@littler.com
pprynkiewicz@littler.com
*Attorneys for Defendants Southwest Airlines, Co.*

Dominique Barrett
Lori Metcalf
**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**
8800 E. Raintree Drive, Ste 100
Scottsdale AZ 85260
dominique.barrett@qpwblaw.com
lori.metcalf@qpwblaw.com
*Attorneys for Defendants Terry Graham and Ryan Russell*

By: *s/Patti A. Hibbeler*

CRONUS LAW, PLLC